(No. 21759.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* IRVING GREBEN, Plaintiff in Error.

*Opinion filed April 22, 1933—Rehearing denied June 9, 1933.*

HEARD, C. J., and ORR and JONES, JJ., dissenting.

RALPH A. BERKOWITZ, and GEORGE H. SUGRUE, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Irving Greben and Leo T. Nowicki were tried in the criminal court of Cook county upon an indictment of four counts, the third of which charged them with the conversion to their own use of certain described sums of money and one check, order for the payment of money and instrument of writing of the value of $622.73, the property of Margaret Etges, with intent to steal, take and carry away the same, the personal goods, funds, money and property of Margaret Etges, which were then and there delivered and entrusted to them as bailees, whereby and by force of the statute they are deemed to have committed the crime of larceny. The fourth count charged the defendants, as agents of Margaret Etges, with embezzling and converting to their own use certain described sums of money and one check, order for the payment of money and instrument of writing of the value of $622.73, the property of Margaret Etges, which were delivered to and came to the possession and care of the defendants by virtue of such employment, whereby and by force of the statute they are deemed to have committed the crime of larceny. They were convicted on a trial, the jury finding them "guilty of larceny in manner

and form as charged in the indictment," and further finding the value of the property stolen to be $622.73. They were sentenced to the penitentiary and Greben alone has sued out a writ of error.

Plaintiff in error insists that the evidence was insufficient to sustain the verdict, that the felonious intent to embezzle or convert to his own use was not shown, and that the court erred in its rulings on the evidence and the instructions.

It appears from the evidence that in May, 1930, and later, the two defendants were conducting a business under the name of the National Tax Appraisal Company, in the Builders' building, in LaSalle street, in Chicago. They made appraisals of real estate. Their office was in the offices of Walter Dienhart. Apparently the business was a partnership owned and managed, conducted and controlled by the two defendants, assisted by different agents and employees. A certain part of the business of the partnership was conducted under the name of the Property and Tax Service Association. The evidence indicates that the defendants were owners of the whole business conducted under both names. The employees of the common enterprise, whatever the nature of their duties, were employed in the name of the National Tax Appraisal Company, and all the money received, whether under the name of the Property and Tax Service Association or the National Tax Appraisal Company, was deposited in the Northern Trust Company in an account subject to the check of the two defendants, Leo Nowicki and Irving Greben, both to sign all checks. The employees, whether employed by the one name or the other, were paid by checks drawn on this account and signed by both defendants.

Allen H. Lewis and Nowicki worked for the board of assessors in 1928. Lewis testified that in 1929 or 1930 he worked for Nowicki in the Builders' building. They were appraising the town of Cicero and his work took him there.

That work ceased in December, 1930. Afterward Nowicki employed him to work for the National Tax Appraisal Company, and he worked for that company until January, 1931. The National Tax Appraisal Company made appraisals for the Property and Tax Service Association. William Kettle was the book-keeper of both the appraisal company and the tax service association. Sometimes Nowicki and sometimes Kettle handed him his money. When witness was paid by check it was signed by both Greben and Nowicki.

William Kettle, the book-keeper, was employed in May, 1930, by Nowicki, who told him what his duties were. He was paid sometimes in cash and sometimes by checks signed by Greben and Nowicki. He kept the books for both the Property and Tax Service Association and the National Tax Appraisal Company. Both Greben and Nowicki examined the books. Daily report sheets were made by Kettle and signed by Nowicki. Money came into the Property and Tax Service Association from payments by members of membership fees, to have cases started in court and on account of taxes to be paid the county collector. There was no other source of income. The National Tax Appraisal Company had occasional members, from which source it had some income. It also received one-sixth of the membership fees from the Property and Tax Service Association. This was for making appraisals. When money came in for the payment of taxes it was so marked in the cash book.

Margaret Etges owned a parcel of real estate on North Damen avenue on which was a two-flat apartment building and her husband another on Summerdale avenue on which was a six-apartment building. About April 9, 1931, an agent of the defendants named Cornell called on Mrs. Etges and her husband, John J. Etges, at their home, and at his solicitation she signed an application for membership in the Property and Tax Service Association. Cornell saw their tax bills and said he would have the property re-appraised

and could save them money. They would have to pay a fee to join the organization—$12 for the two-flat building and $30 for the six-flat building. This amount of $42 they paid. Mrs. Etges sent the two tax bills (her own bill for $363.18 and her husband's for $523.31) by her son to the Property and Tax Service Association on July 14, 1931. The association a few weeks later made a report by letter to Etges, showing, as a result of its examination, that the difference in the amount of tax required to be paid on the property of Mrs. Etges was $113.36 and on Etges' $150.60, making the amount which should be paid $249.32 on her property and $372.91 on his. The letter suggested that the amounts specified should be paid at their earliest convenience. Accordingly, on September 25, 1931, Mrs. Etges, with her husband, went to the office of the Property and Tax Service Association. She took with her a blank check on the Uptown State Bank of Chicago and it was filled out there for $622.73, payable to the order of the Property and Tax Service Association. She gave the check to Al Gabel in the office to cover the amount of the taxes she was told to pay—which they estimated she and her husband should pay. She told him that should be taken care of immediately; that money must be paid for the taxes, and the taxes must be paid immediately because it was a little bit late already. He said to her it was a little late that afternoon, because it was about three o'clock, but he would take care of it the first thing in the morning and see that the taxes were paid. He gave her the association's receipt for the check. She called his attention to the fact that it was made in Etges' name, and he told her that it would not make any difference—that it belonged to them both. The check was paid by the bank. She got it back from the bank and it was charged against her account. No part of the amount was returned to her and the taxes were not paid. She did not know either Nowicki or Greben. She never saw Greben until after the events which have been stated.

When the check was received, Kettle, the book-keeper, showed its receipt and the purpose of it on the books of the Property and Tax Service Association and deposited it in the Northern Trust Company to the credit of the National Tax Appraisal Company's account the same day. It was returned for lack of funds to meet it, and was subsequently certified and again deposited on September 29 to the credit of the appraisal company. After this the plaintiff in error and Nowicki jointly drew checks of the appraisal company against its account until the deposit was exhausted and an overdraft of $8.69 existed. Of the withdrawals, $163 was charged to Nowicki personally and $304 to the plaintiff in error. The account showed $217.70 to the credit of the appraisal company before the deposit of the check for $622.73. Including this check, the sum of $810.32 was deposited on September 25. On September 26 there was a further deposit of $128.94. Against the account thus amounting to $1156.96, checks were drawn and paid to October 2 amounting to $1165.65, causing the overdraft of $8.69. So the money delivered by Mrs. Etges to the Property and Tax Service Association was misappropriated. No part of it was applied to the payment of the taxes for which it was delivered. The tax service association did not replace the money, and its business was terminated in the following January by the State's attorney of Cook county. The daily report sheet of the book-keeper, Kettle, showing the receipt of the $622.73, was submitted to and signed by Nowicki. There was no direct evidence to show that the plaintiff in error had actual knowledge that the specific item of $622.73 had gone into the bank account of the appraisal company and constituted a part of the credit against which he, jointly with Nowicki, drew checks until the credit was exhausted.

Neither Nowicki nor the plaintiff in error testified. They employed Joseph L. McCarthy, a lawyer, to incorporate the Property and Tax Service Association. The charter was is-

sued November 17, 1930. McCarthy became its president and remained so for two or three weeks. He was succeeded by Arthur E. Stevenson, who was employed by the plaintiff in error at a salary of $50 a week. Stevenson testified: "Mr. Nowicki was in charge of the appraisal department. Mr. Greben was a partner of the National Tax Appraisal Company. To my knowledge there were no other partners. Mr. Nowicki was a partner. Mr. Greben and Mr. Nowicki were in authority in the Property and Tax Service Association of Illinois. Greben was secretary and treasurer of the Property and Tax. To my knowledge Mr. Nowicki did not hold any office. He served in the capacity of handling all their appraisals and the details to it and worked in the association from that angle. I became the president of the organization after I was there about two weeks. I talked with Mr. Nowicki or Mr. Greben before I assumed the duties of the president of the association. Mr. Greben advised me that Mr. McCarthy had been president; that they were going to make a change and that they were going to make me president of the association, and that they would have the offices ready in about three weeks (the new office for the president and for himself) in the suite there. I was president of the organization until it was closed. My duties were of a general nature in reference to sales meetings and always in connection with the appraisals, complaints on appraisals and sales work generally. Mr. Greben and Mr. Nowicki were in authority after I became president. I knew Mr. Al Gabel. He worked for the Property and Tax Service Association of Illinois. He was to work there when I went there. His duties were of the nature of a sales manager. He was working under the direction of Mr. Nowicki and Mr. Greben. I had no authority over him. * * * Mr. Gabel's duties were to handle and hire salesmen, take their receipts and memberships, and things of that kind, as a salesman turned them in, and turn them over to the book-keeper, Mr. Kettle, a general sales manager

for the membership plan. I don't know specifically who had authority to accept money received from memberships except from practice. Mr. Gabel had authority. I don't know specifically on that. I knew he did accept it, but where the authority came from, on that I don't know specifically. * * * Mr. Gabel, and later in the year Mr. Dienhart, contacted members when they came up to the office. * * * Mr. Gabel gave orders to the salesmen, and at sales meetings Mr. Nowicki on appraisals and Mr. Greben on general sales. The duties of the salesmen were to contact the property owners and to solicit their membership in the association. That was the duty of Mr. Cornell when he acted as salesman. Mr. Greben and Mr. Nowicki conducted the offices of the Property and Tax Service Association of Illinois in an executive capacity in 1931. At the same time Mr. Nowicki conducted the offices of the National Tax Appraisals in an executive capacity. * * * My work was of a general nature in reference to sales and to handling details around the office—whatever Mr. Greben and Mr. Nowicki told me to do. I gave sales talks two or three times. I had no supervision over the help. I talked to customers. * * * We never had a meeting of the board of directors of the corporation at any time."

From what has been stated it is apparent that Nowicki and the plaintiff in error were the managers in control and exclusive operators and owners of the two associated organizations; that money received by either organization was deposited to a single account and withdrawn only upon checks signed by both Nowicki and Greben. The Property and Tax Service Association had a number of salesmen. Gabel was the office man with whom the public ordinarily came in contact, Kettle the book-keeper, and Nowicki and the plaintiff in error the directing heads and managers of the business.

The check, the proceeds of which the indictment charges the defendants embezzled, was drawn by Mrs. Etges, signed

by her with her own name, paid by the bank on which it was drawn and deducted from her account in the bank. It is argued that there is a failure of proof of the material allegation in the indictment of Mrs. Etges' ownership of the property embezzled, and it is contended that the evidence shows that the check was the joint property of John J. and Margaret Etges and not the property of Margaret. This contention is based on Mrs. Etges' answers to questions asked her on cross-examination that she gave the check to pay the taxes on her husband's property and her own, and her answers to questions put by the court after an objection had been sustained to a question by the plaintiff in error's attorney:

The court: "You may answer the question whether those funds were your own at the time, or were they supposed to be partly your husband's?

A. "I don't know what I should say to that.

Mr. Berkowitz: "You are supposed to tell the truth.

A. "I am all puzzled. I don't know what the question was. (Question of the court read.)

The court: "That is, were they supposed to be joint checking signatures of yourself and your husband or only of your own self in checking?

A. "Well, at that time the checking was joint at that time."

Exactly what Mrs. Etges meant by this answer is not clear. Manifestly she did not mean that only checks bearing the signatures of both husband and wife would be paid, for the check in question was her own individual check given to withdraw the amount named and it was honored. The answer has no tendency to show that the account was a joint deposit. The question was manifestly confusing to the witness. She testified that the amount of the check was deducted from her account in the bank, and it may be that the husband was also authorized to check on her account. In any event, when the check was paid its amount was

severed from the deposit, and the joint ownership, if any had previously existed, was destroyed. There was no variance and no failure of proof of the ownership of the property alleged to have been embezzled.

It is also contended that there is a failure to prove beyond a reasonable doubt the felonious intent of the plaintiff in error fraudulently to embezzle or convert to his own use. The evidence tends to show the course of business of the defendants to mingle the funds received by both organizations, from whatever source, by depositing them in one bank account and use the whole amount for the payment of the obligations of the whole business of both organizations; that money received in trust for the specific purpose of paying taxes on particular property was so deposited in the general account and checked out until the account was exhausted, leaving the taxes unpaid. While Mrs. Etges never saw the plaintiff in error until after the return of the indictment, and while it does not appear that the plaintiff in error ever saw her check or knew that she had applied for membership in the Property and Tax Service Association or that the association had any business with her or her property, the evidence tends to show that the tax association and the appraisal company were really only names under which the defendants operated through the various agents employed by them, that the collections and disbursements made in the course of the business were made with their knowledge and by their directions though the various items may not have come directly under their personal observation, and that they are responsible for such misappropriation and embezzlement of trust funds, if any, as are shown by the evidence beyond a reasonable doubt.

The verdict found the defendants "guilty of larceny in manner and form as charged in the indictment," and further found "the value of the property so stolen to be $622.73." The plaintiff in error contends that this is a verdict of guilty of larceny at common law and therefore

is not responsive to the indictment, which charges only larceny as bailees in one count, and in another embezzlement, as agents, of property delivered to the defendants by virtue of their employment as such agents, whereby by force of the statute they are deemed to have committed the crime of larceny. The argument is, that "stealing is the distinguishing element between larceny and embezzlement, and they contend that by using the word 'stolen' the jury returned a verdict of common law larceny, and such a verdict is not responsive to the proof and the allegations in the indictment." It is true that larceny at common law, and embezzlement, which constitutes larceny under the statute, are distinct offenses, and evidence of either will not support a conviction on an indictment charging the other offense. An indictment for larceny by embezzlement must set out the acts of embezzlement and then aver that so the defendant committed larceny. (*Kibs* v. *People,* 81 Ill. 599.) This was done in this case. The form of the verdict is sufficient. The jury must find the value of the property embezzled, whether more than $15 or not, and thus determine the punishment to be imposed. This is the only purpose of the requirement. (*People* v. *Jasiecki,* 301 Ill. 23.) The verdict was sufficient to enable the court to determine the appropriate punishment.

It is argued that incompetent evidence was introduced over the plaintiff in error's objection. The evidence objected to related to transactions between different agents of the plaintiff in error on one side and Mr. and Mrs. Etges on the other in regard to Mr. and Mrs. Etges becoming members of the association, what was required of them and what the association could and would do for them. Another conversation was after the indictment was found, between Etges and the plaintiff in error, tending to show an effort by the plaintiff in error to settle the criminal liability by settling the civil liability. All of this evidence was competent. In regard to another conversation between

Stevenson and Nowicki nothing appears in the abstract except Stevenson's testimony that the conversation was in reference to details of the appraisal department, how it functioned and what it was in general. There was no error in admitting the evidence complained of.

Complaint is made of the giving of instructions 2, 3 and 4 requested by the People. They are as follows:

2. "The court instructs the jury, in the language of the statute, that whoever embezzles or fraudulently converts to his own use, money, goods, or property delivered to him, which may be the subject of larceny, or any part thereof, should be deemed guilty of larceny. If one receives money to pay taxes of another, he is guilty of fraudulent conversion if he uses the money for his own and other purposes. One is not guilty of fraudulent conversion if one did not receive the money for such purposes or if one did not use the money for his own purposes.

3. "The court instructs the jury, that if you believe from the evidence beyond a reasonable doubt, that the defendants or either of them conducted the entire businesses of both the corporations, known as the Property Tax Service Association and the National Tax Appraisal Company, and if you also believe from the evidence beyond a reasonable doubt, that in the course of conducting said two businesses, the defendants or either of them, knowingly received into their joint bank account from Mrs. Etges, the sum of $622.73, upon the expressed agreement with the agent of said defendants to pay said $622.73 to the county collector upon account of the taxes duly levied on the real estate, properties of both Mr. and Mrs. Etges, and if you further believe from the evidence beyond a reasonable doubt, that the defendants or either defendant, so receiving the said sum did not pay to the county collector said sum, or any part on account of the taxes duly levied in question, but fraudulently otherwise used the said sum so received to pay for their own purposes, you will find the defendants guilty.

4. "The court instructs the jury, as a matter of law, that to constitute the offense charged in this case, the intent alleged in the indictment is necessary to be shown, but such intent need not necessarily be proven by direct evidence.

"If the jury believe, beyond a reasonable doubt, that the intent charged in the indictment is shown by the facts and circumstances in evidence, that is sufficient."

The first sentence of instruction 2 is in the words of the statute. The other two are abstract in form and as applied to the evidence in this case are misleading, for they are open to the construction that they assume that the plaintiff in error received the money.

Instruction 3 is erroneous because it requires the conviction of both defendants if one is guilty.

Instruction 4 was properly given. It is argued that it should not have been given because held bad in many cases. *People* v. *Ervin,* 342 Ill. 421, is cited in support of this statement but does not sustain it. The instruction held erroneous in the *Ervin case* was not the instruction given in this case. That instruction stated that the intent may be proved by direct and positive testimony or be inferred from all the facts and circumstances in the case, and it was held bad because the jury might readily understand the instruction to assume the presence of the required intent. Whether the particular facts and circumstances shown by the evidence in the case on trial are such as to justify an inference of the intent alleged in the indictment is a question for the jury and not the court. (*People* v. *Johnson,* 333 Ill. 469; *People* v. *McLaughlin,* 337 id. 259.) This question was submitted to the jury in this case by the second sentence of the fourth instruction.

All the requests of the defendants for instructions were refused. Among them were the following:

1. "The court instructs the jury that the mere proof of the receipt of funds and the failure to account for the same is not sufficient in itself to show embezzlement. There

must be evidence of a fraudulent intent to convert such funds to his own use, and unless there is evidence beyond a reasonable doubt that the defendants, or either of them, fraudulently converted the same to their use or to the use of either of them, then the jury must find the defendants, or either of them, not guilty."

2. "Before the jury are warranted in finding a verdict of guilty as to any one of the four counts in the indictment, you must be convinced from all the evidence beyond a reasonable doubt that the property converted to the use of the defendants, was the property of Margaret Etges, and not the property of any other person. If the jury believe from the evidence that the property described in the indictment as being the property of Margaret Etges, was not the property of Margaret Etges, but belonged to Margaret Etges and J. J. Etges jointly, you should find the defendant not guilty as to each and every count of the indictment."

6. "The fact that a defendant did not testify in this case does not create any presumption of guilt against him and should not have influence upon you in arriving at your verdict."

These instructions correctly stated the law and should have been given. *People* v. *Davis,* 269 Ill. 256, and *People* v. *Ervin, supra,* sustain the first, and *People* v. *Feldstein,* 342 Ill. 615, and *People* v. *Smith,* 341 id. 649, the second. Neither of the defendants testified, and they were entitled to have the statutory rule stated in the sixth instruction given to the jury.

Because of error in giving and refusing instructions the judgment is reversed and the cause remanded.

*Reversed and remanded.*

HEARD, C. J., and ORR and JONES, JJ., dissenting.