(No. 26355.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSHUA D. HENDERSON, Plaintiff in Error.

*Opinion filed Nov. 24, 1941—Rehearing denied January 15, 1942.*

Shaw, Gunn, and Smith, JJ., dissenting.

GREEN & PALMER, (ORIS BARTH, of counsel,) for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and WILLIAM L. SPRINGER, State's Attorney, (FRED B. HAMILL and ROY C. FREEMAN, of counsel,) for the People.

Mr. JUSTICE FARTHING delivered the opinion of the court:

Joshua D. Henderson, aged sixty-nine, was indicted in the circuit court of Champaign county for embezzlement of the moneys of the St. Joseph Building, Loan, and Investment Association. He was found guilty by a jury of

embezzling $612.91 from that association, and was sentenced. He has sued out this writ of error to review the judgment of conviction.

Eugene J. Murphy, an accountant employed by the Auditor of Public Accounts in Springfield from 1933 to 1938, was sent by the chief building and loan examiner to examine the St. Joseph Building, Loan and Investment Association, hereafter called the association. Upon his arrival in St. Joseph on March 15 or 16, 1934, he introduced himself to the defendant, the secretary of the association, and told him the purpose of his visit. The defendant delivered to Murphy the books of the association that he requested, and Murphy and his assistant began verifying the accounts. Murphy testified that just before quitting time at the end of the first day of the examination, he asked defendant about several entries in the books and said, "Now these, they don't look right to me and I wonder if you have any recollection of them having been corrected later on in the year." Defendant said he couldn't remember; that it was too far back. Murphy questioned him about some other items, and defendant objected and said: "Why don't you come around here every year the way you are supposed to and then I would probably know something about these things." Murphy then said, "You better jog your memory and see if you can't remember what happened in these transactions, and if you can't you better start thinking of where you are going to get about $800 to put in here before I leave, to take care of these differences." Defendant replied: "Oh you are crazy." Nothing further was said at that time. The defendant testified that he could not recall this conversation, but he did not deny that it had taken place. In the evening of the second day, Murphy received a call from his superior in Springfield. Murphy testified that the following morning defendant asked him if he had been in touch with Springfield, and Murphy replied: "Yes." The defendant then said: "Well,

I guess you know all about it then," to which Murphy replied: "Yes, I do." Murphy then suggested they take a walk to defendant's home, and the defendant agreed to this. The defendant's attention was not called to this conversation, but he did testify he took Murphy to his home on the second or the third ·day of the examination. Defendant's home was located in the same block as the office of the association. Murphy testified that at defendant's home he asked defendant what was going on. Defendant told him that when he took over the secretary's job approximately twenty-one years ago, a shortage existed in the association's funds, and that he called the attention of one of its directors, U. G. Swearingen, to this. Swearingen told him to go ahead and that he would see that the shortage was taken care of. Swearingen died, and defendant then told another director of the association, its president, I. N. Walker, about the shortage and Walker also told Henderson to go ahead and he would see that the shortage was taken care of. When outstanding certificates of the association came in for redemption, the defendant issued and sold new ones to take them up. Murphy testified he asked defendant whether he had any record of these certificates and defendant replied that he did. Murphy asked to see the record, and defendant produced it from among the records at his home. This record is designated People's exhibit No. 5, and is known as a stock-certificate record. Murphy testified that a stock-certificate book was also delivered to him at the same time, but he was unable to identify the exact book among a group of such books. Nothing else was said in reference to whether the defendant kept the above records in his home all the time, or why they were not in the office of the association. Murphy denied that at the time of the conversation the defendant showed him defendant's exhibit No. 300, which purports to be a note bearing date of June 30, 1932, for $20,000 payable to the association and signed by I. N. Walker,

which Henderson testified was given to him by Walker to cover most of the shortage in the association. Henderson's version of this conversation is different. He testified that he told Murphy that he had a part of the books of the association at his home, as he frequently had, because of his duties as secretary of the association, and that he would deliver them to Murphy at his home. He also told Murphy that he wanted to turn over all of the affairs of the association to him. He said he turned over all the books of the association to Murphy, but he was not able to recall which books he delivered at his home. Although he could not recall delivering either People's exhibit No. 5 or People's exhibit No. 7, a stock-certificate book, to Murphy, while at his home, he did not deny delivering them there.

Murphy identified many of the records of the association he had examined and testified they were delivered in the same condition as when obtained from Henderson, to Rosenberger, who completed the examination of the association after Murphy had gone. Murphy gave Rosenberger the data that he had obtained, and informed the latter of his conclusions. Rosenberger completed the examination of the records of the association. He arrived in St. Joseph about March 20, 1936, and had a short conversation with the defendant. They discussed the condition of the association, and the shortage that defendant had found in its book shortly after he became secretary. They met Murphy, and he turned some of the records of the association over to Rosenberger, and defendant delivered other records to him. People's exhibit No. 5 was one of the records delivered by Murphy. Rosenberger identified the records that had been delivered to him at the time of this first meeting, and testified that People's exhibits Nos. 6, 7, 8, 9, 10, and 11, all of which were stock-certificate books, were not among those records. Rosenberger also testified that defendant told him the last named records were kept at his home, but, on cross-examination, he admitted that Murphy,

and not the defendant, had given him this information. Murphy brought the last mentioned records to the office of the association during the first day that Rosenberger was there. A few days later defendant voluntarily delivered to Rosenberger People's exhibit No. 118, two large yellow sheets of ledger paper entitled "Cash receipts," and, the next day, People's exhibit No. 117, a small blue book. This contained the heading "Cash Collected for B & L," followed by fifteen items from five people, referred to later. According to Rosenberger, defendant told him that the items listed in these two exhibits were collections that he had made but which he had not turned over to the association, and that he would pay them back when he could. Nothing else was said in reference to either of these two exhibits. The defendant denied making these statements to Rosenberger and testified that instead he told Rosenberger when he delivered exhibit No. 118 to him: "Mr. Rosenberger, here are some collections that represent an incompleted transaction. I have handled this according to our custom, particularly at this time of the year when taxes must be paid and large per cent of insurance is rewritten in taking care of taxes to prevent tax sales and in paying for insurance premiums that have been written, and there has been no meeting of the directors recently at which I could present my items of expense for things and get it allowed and turned in and these entered on the regular sheets and that there is also some insurance expiring very soon I want to call your attention to." On cross-examination as to his conversation with Rosenberger when defendant gave him exhibit No. 117, defendant said: "It was, in substance, to the effect that this book also represented some collections which I had made and had not recorded for two reasons; one being that some of it was used for the same purpose that this on exhibit No. 118 was used and for the further and more important reason that much of it was collected under receivership and contract, which is a separate matter than

the ordinary loans and a separate set of books had been set up for us by Professor Scovill with headings for this kind of transaction, and I wanted to talk to him or the examiners so as to know just how to make these entries on that new set of books." Henderson also said he told Rosenberger that he hoped to turn in his itemized bill for the insurance and taxes which he had paid, as soon as he had an opportunity to do so. Rosenberger denied that any such conversation took place and denied that defendant made those statements to him.

In addition to being secretary of the association, the defendant wrote insurance. Some insurance on the property which belonged to the association expired. Rosenberger said he gave defendant permission to renew two or three policies, but did not make arrangements for the payment of the premiums.

The defendant admitted making the collections listed in exhibits Nos. 117 and 118, but denied that he intended to apply this money to his own use. He testified that Rosenberger never demanded that he account for the items listed in the two exhibits. He claimed he gave Rosenberger a memorandum of a few of the expenditures but Rosenberger denied this. At the trial, Henderson did not present receipts for any expenditures or show what the amounts were or to whom paid. He made no claim he had furnished Rosenberger or anyone else a complete list of them. The defendant testified that the collections listed in exhibits Nos. 117 and 118 did not appear on the regular books of the association, and that if they had been entered they would be found in People's exhibit No. 4, the cash receipt book. This book was kept by the defendant personally or under his supervision. The defendant examined it while on the witness stand, but could not find therein any of the items listed in either of the two exhibits. Rosenberger also testified that the amounts credited to the various individuals named in the two exhibits were not credited in their re-

spective ledger accounts. One page of exhibit No. 117 has at its head, "Cash collected for B & L." Under this heading are listed five names, R. E. Swearingen, Fred Penrod, Dr. Layman, Harold Denhart, and Geo. Claypool, and under each name is the amount collected by defendant from each individual for a particular month. The items listed on this page total $180.90.

Fred Penrod testified that he made cash payments to the defendant as secretary of the association on his contract to purchase property from it. They totalled $11.10 and the receipts for them signed by Henderson are in evidence.

Dr. G. L. Layman testified that he rented an office from the association from 1935 to the spring of 1937, and that he paid the rent to the defendant personally so long as the latter was in the office adjacent to the witness. This payment was usually by check and was sometimes made in cash. The witness had searched for the cancelled checks, and for the rent receipts, but had been unable to find any of them.

People's exhibit No. 118, the yellow ledger sheets, also contains a statement of the amounts collected by defendant from certain individuals for specified months. The amounts listed in this exhibit total more than $400. Ethel Besore, named in exhibit No. 118, testified she paid $15.17 in cash to the defendant, the receipt for which is in evidence. F. A. Rise, also named in exhibit No. 118, testified he made payments on his loans from the association to defendant, and that the last payment recorded in exhibit 118 of $20.58 was in cash.

Other persons listed in exhibit No. 118 also testified, but it is not necessary to detail their testimony here. In every case they testified making the payment described in exhibit No. 118 either in cash or by check to the defendant.

Rosenberger testified that the stock book, People's exhibits No. 7, was one of the association's stock books. It

contained a stub of certificate No. 2 of "class 22-D stock" which was paid-up non-participating stock and bore interest at a fixed rate—two per cent in this case. He testified that no other books of the association showed the sale of this stock, and to verify the stub he advertised for the owner. In response, Chris Denhart brought in the certificate which was for one share of the par value of $100. Denhart testified that after he had made monthly payments on installment stock for about two years, about 1934 he converted the stock he was paying on, into the paid-up stock, and paid Henderson the difference of $30 in cash, for which he received no receipt. Defendant denied Denhart gave him any money for the paid-up stock.

We cannot agree with Henderson's contention that it was prejudicial to him that, in several instances, after certain testimony had been given, the court allowed his motion to strike and directed the jury to disregard the testimony. Some of the testimony was stricken because it covered transactions that took place beyond the statutory period of limitation, and some of it for other reasons, but, regardless of this, the action of the court fully protected Henderson.

It is not necessary to pass on the contention that Henderson could not be convicted of embezzlement of money by proof that he, as secretary of the association, embezzled checks. There was a sufficient amount of money paid to him in cash to amount to far more than $15, which he kept. The Criminal Code (Ill. Rev. Stat. 1941, chap. 38, par. 210) provides, in part, in reference to embezzlement, "he shall be deemed guilty of larceny and shall be punished as provided by the criminal statutes of this State for the punishment of larceny." In *People* v. *Jasiecki*, 301 Ill. 23, 29, this court said: "The fact that the jury did not give the plaintiff in error credit for some of the money for which he properly accounted did not prejudice his rights in the least. The statute makes embezzlement larceny, and the punishment fixed for larceny is imprisonment in the peni-

tentiary if the property stolen exceeds the value of $15. The only purpose in requiring the jury to find the value of the property stolen is to have it properly determined that the property had some value and that the value was either more or less than $15." This makes it unnecessary to consider the decisions in *Goodhue* v. *People,* 94 Ill. 37, and *Weimer* v. *People,* 186 id. 503, or to show similarity between this case and *People* v. *Ervin,* 342 id. 421.

Henderson contends that the People had the duty but failed to prove that the money he received had not been paid into the treasury of the association. He relies on *People* v. *Wulff,* 313 Ill. 286. At page 288 of that opinion it is said: "These slips and tapes were regular on their face and showed that Wulff had properly accounted for his collections. The accountant testified to a large sum of money that had been collected and not properly credited, but he did not testify that the city did not get the money. In the case of the five checks hereinbefore mentioned the accounts were not properly credited but the proof shows that the city did collect the money represented by these checks. There was therefore no shortage as far as these checks were concerned, and there is no proof that the omission to properly credit the accounts of the drawers of the checks was Wulff's omission." In that case the People relied largely upon a $7462.95-check but it was shown Wulff had accounted for that check to the city's cashier. Wulff admitted that he was short a large amount of cash which he said a confederate he would not name had removed from his cage, and that he (Wulff) covered the cash by reporting the checks and accounting to the cashier. Although the sentence, "The *corpus delicti* cannot be proved by the confession of the accused" appears in that decision on page 289, the decision, when analyzed, shows that the quoted sentence cannot be given its literal meaning. The holding was that the *corpus delicti* could not be proved by confession or admissions alone. The mention made of the

fact the accountant failed to testify that the city did not get the cash Wulff had collected, served only to point out the absence of corroborating proof of the *corpus delicti.*

Four elements of fact are required to be proved to establish embezzlement, viz., that the accused was, by the terms of his employment, charged with the duty to receive the money or property of his principal; that he obtained possession of it; that this was in the due course of his employment and that although he knew the money or property did not belong to him, he converted it to his own use or the use of someone other than the real owner. *People* v. *Parker,* 355 Ill. 258, 282.

Henderson contends that here the *corpus delicti* was not proved by any evidence except the statement Rosenberger testified the defendant made in which he promised to repay the money covered by the items on exhibits Nos. 117 and 118. We have pointed out the fact that the proof showed other cash items paid to Henderson, not covered by those exhibits, were not found in any of the records of the association and that Henderson failed to show any sums of money he claimed he had paid out for the association by way of taxes and insurance premiums.

The answer to the contention that the confession or admissions of one accused of embezzlement cannot be used to prove the *corpus delicti,* is that it is the mere naked uncorroborated confession that is insufficient to convict, and that the *corpus delicti* is not required to be proved beyond a reasonable doubt by evidence which excludes or is aside from the confession or admissions of the accused. Direct and positive evidence is unnecessary to the proof of the *corpus delicti* and it is not essential that the *corpus delicti* shall be established by evidence other than that which tends to connect the accused with the crime. The same evidence which tends to prove one may also tend to prove the other, so that the existence of the crime and the guilt of the defendant may stand together on one foundation. The test is whether the whole evidence proves the fact a crime was

committed and that the accused committed it. *People* v. *Nachowicz*, 340 Ill. 480, 495; *People* v. *Hauck*, 362 id. 266, 272.

In view of what has been said, it hardly seems necessary to discuss the contention that Henderson was not proved guilty beyond a reasonable doubt. If, in spite of Henderson's denials, the jury believed the testimony of Rosenberger that defendant admitted he had used the association's money, and offered to repay it as soon as he could, and the testimony that he received $30 from Denhart and other cash payments, no record of which was kept, the *corpus delicti* and the guilt of the defendant were established beyond a reasonable doubt.

We will not set aside the jury's finding on the sole ground that the accused testified he did not take and use the money for his own purposes, or his uncorroborated testimony that he had paid out money for taxes and insurance premiums, and therefore had an account that was not stated between himself and the association.

Henderson complains of the giving and refusal of instructions. He says that by the sixth given instruction the jury was told that the presumption of innocence is only intended to apply where the accused is innocent. We do not agree with this contention, for, instead, the instruction said that the presumption of innocence is not intended to aid a guilty person to escape, but is a humane provision intended, as far as human agencies can, to prevent an innocent person from being convicted. Moreover, the twelfth given instruction fully and correctly instructed the jury that this presumption remains in force throughout the trial and until the jury has arrived at its verdict. Instructions must be read as a series.

Defendant claims the court erred because it did not give the eighth and ninth refused instructions. He relies on *People* v. *Greben*, 352 Ill. 582, referred to later, in support of his contention that this was error. The eighth refused instruction is ambiguous and confusing because the word

"account," when used for the first time, may have meant the situation between parties where there is no written account but there are dealings out of which each has a claim or claims against the other, while the word "account," found later in the instruction, refers definitely to exhibits Nos. 117 and 118 without naming them when it says "items of money and property appearing in said account" and "any of the money or property evidenced by said account."

The ninth refused instruction was: "The court instructs the jury that if you believe from the evidence there existed an unsettled account between the defendant and the St. Joseph Building, Loan and Investment Association, growing out of collections received by him, referred to in People's exhibits numbered 117 and 118, and out of moneys paid out by defendant on account of the Association for insurance premiums and taxes on properties in which the Association was interested, that fact, if it be a fact, is not in and of itself proof of embezzlement of the moneys received by the defendant and referred to in said exhibits."

These two instructions were bad because they called the attention of the jury to particular facts in evidence (*Chapman* v. *Cawrey*, 50 Ill. 512) and because particular portions of the evidence were singled out. *Drainage Comrs.* v. *Illinois Central Railroad Co.* 158 Ill. 353, 358; *Minnis* v. *Friend*, 360 id. 328, 338.

The instruction in *People* v. *Greben, supra,* relied on by Henderson was similar only in part to the refused instruction No. 8. There, two bad instructions were given and two additional instructions were refused which should have been given. The case is not in point here.

We find no prejudicial error in the record that would require a reversal of the judgment of conviction and for that reason it is affirmed.                    *Judgment affirmed.*

SHAW, GUNN, and SMITH, JJ., dissenting.