(No. 27231.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM J. LONG, Plaintiff in Error.

*Opinion filed January 18, 1944—Rehearing denied March 16, 1944.*

EDWARD PREE, L. G. PEFFERLE, both of Springfield, and HARDIN E. HANKS, of Rushville, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and ERNEST G. UTTER, State's Attorney, of Rushville, (C. G. COLBURN, of Virginia, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

. An indictment was returned by the grand jury in the circuit court of Schuyler county charging Wm. J. Long (hereinafter called the defendant) with the embezzlement of $8000. The indictment consisted of five counts. The fourth count charged embezzlement as an attorney at law. The remaining counts, under which defendant was found guilty, in varying language, charged the defendant as agent of Ruth E. Mills, J. Teel Mills, and Theodore R. Mills, with embezzling, on May 1, 1942, the sum of $8000, described as property belonging to the said Ruth E. Mills, J. Teel Mills, and Theodore R. Mills, received by defendant in his fiduciary capacity as such agent. A general motion to quash the indictment was made and overruled. Defendant was tried and convicted. The jury found him guilty under all counts except the fourth, and found the value of the property embezzled to be $8000. A motion was made by defendant at the close of the People's case and renewed at the conclusion of all the evidence for a directed verdict of not guilty. These motions, as well as the motions made by defendant for a new trial and in arrest of judgment, were overruled, and defendant was sentenced to the penitentiary. This writ of error was thereafter sued out.

Defendant claims that the verdict is not sustained by the evidence, that the essential elements of the crime of embezzlement were not proved, that there was a fatal variance between the proof and the allegations of the in-

dictment relative to the ownership of the funds involved, and that the court erred in its rulings on the evidence and the instructions.

The facts of the case as disclosed by the evidence are as follows: One Herschel Teel died intestate May 27, 1938, leaving a widow and the said Ruth E. Mills, J. Teel Mills, and Theodore R. Mills, who were the children of his deceased sister, as his only heirs-at-law. In December, 1940, Everett L. Mills, an attorney of Canton, Ohio, and a cousin of the Mills children, on their behalf employed the defendant to represent J. Teel Mills in the proceedings then pending in the circuit court of Schuyler county for partition of the real estate owned by Herschel Teel at the time of his death. The terms of this employment were proposed by defendant in his letter to Mills of December 17, 1940, and are as follows: "For a fee of $200, payable when distribution is made from pending partition suit, I will investigate the entire proceedings and do whatever might be possible to benefit the interests of Teel Mills." Defendant was the third attorney representing J. Teel Mills and his brother and sister in the partition proceedings. The one first employed died, and his successor had abandoned the case and moved to Florida prior to December, 1940. Thereafter defendant represented J. Teel Mills, Ruth E. Mills, and Theodore R. Mills. He had the first appraisement of the property set aside, a higher appraisal made, and at the partition sale on May 27, 1941, at his suggestion and advice, he bid for his clients the full appraised value of the real estate. There being no higher bidder, they became the purchasers of the property. The actions of the defendant in obtaining a higher appraisal of the property and in bidding the full appraised value were for the purpose of forcing a sale of the property at a price in excess of the appraised value and with no desire or anticipation of purchasing the property for his clients. When, unexpectedly, they found the real estate had been sold to

them at a price of $93,000, they met at defendant's office immediately where they discussed with him the situation and made plans for the future. While in defendant's office on that day they signed an agreement among themselves not to file proceedings to partition the land for three years or as long as the purchase-money indebtedness existed against the premises. They also executed a power of attorney, authorizing and empowering defendant in their name and stead to execute, acknowledge and deliver all such papers as might be necessary or required in settlement of the sale of the land purchased by them in the partition proceedings, including mortgages, notes, etc., evidencing deferred payments on said real estate, and to execute all receipts and acknowledge credits on their behalf as to the proceedings of any sales of land not purchased by them at said sale. They also executed and delivered to defendant a second power of attorney, appointing him their agent to do any and all things in connection with their ownership of said land from that date until March 1, 1942, and further authorizing him to collect all income from said premises, and manage and supervise the same, either in his name as agent or in their names as might be necessary to secure for their benefit the income and profits thereof. Defendant, as a part of the same transaction and as evidencing the duties and obligations on his part as such agent, signed and executed the following statement:

"In consideration of the Power of Attorney executed to the undersigned I hereby agree to manage and supervise the real estate of Ruth E. Mills, Theodore R. Mills, and J. Teel Mills purchased on May 27, 1941, at H. V. Teel Partition Sale, in a diligent and proper manner.

From the rents and profits collected thereupon, I agree after deducting compensation hereinafter mentioned to first pay the taxes and drainage assessments against said premises and after reserving sufficient sums to pay any mortgage indebtedness that may become due on said premises in 1942 to distribute the balance equally among said owners.

As my compensation I agree to accept two percent of the amount recovered as rents and profits from said premises plus necessary expenditures for the employment of checkers of grain weights at time of harvesting."

Pursuant to the terms of the above contract, defendant took over the management and supervision of the farm lands. J. Teel Mills, on December 3, 1941, wrote defendant, requesting a report of receipts and disbursements. Defendant promised him a report as of January 1, 1942. This report was not forthcoming. January 12, 1942, defendant was called to military service, and left for Washington, D. C., on January 21, to report for duty. He made no report before leaving and notified none of the complaining witnesses of his prospective departure. Theodore Mills and his wife, hearing that he was going into the army, went to his home to inquire about their affairs and found him packing his trunk. He assured them there was enough money to pay everything, including the note due in June. After he left it was discovered that neither the drainage assessments nor the installment falling due on the mortgage indebtedness were paid. It was also discovered that no crops or grain had been retained for seed, and that defendant the day before leaving had called at the elevator company and collected the money for the same, without leaving anything on deposit for seed. March 10, Theodore Mills wrote him, asking for a report and remittance at once saying something had to be done immediately about getting seed for planting. There is no evidence in the record indicating any reply to this letter. On March 17, after many requests for an accounting, defendant wrote the three complaining witnesses that he was preparing a report based on a fee to him of $8000. Protest was immediately made. Defendant was notified that his fees had been agreed upon and fixed by written contract, and that his claim for a fee of $8000 would not be recognized. After much dispute and delay defendant prepared and de-

livered a report under date of May 1, 1942. This report showed total gross receipts of rents and profits from the farm in the sum of $19,660.31, and a total net receipt of other funds belonging to the complaining witnesses in the sum of $1850.43. His report also showed in the column of disbursements that he had credited himself with $393.20, being his 2 per cent commission on said sum of $19,660.31, and with the further sum of $8000 as "attorney fees for services *in re:* obtaining title to land." His report showed a balance in his hands' due the complaining witnesses of $998.56, and concluded with the following explanatory statement:

"My fees for services other than for farm management, being contingent upon a profit and benefit to my clients, the same are based at approximately 25% of the excess of receipts from farm over expenditures in connection therewith and 25% of the difference in the value of my clients' interest in the land bought at partition sale, if the same had been sold at bid of two thirds of the appraised value (there being no bidders other than the heirs sufficient to authorize a sale of separate tracts over a bid of two thirds of the appraised value of the whole of the premises) and the refusal of clients, prior to the date of this report, to accept approximately $48,000.00 net for their interest in said premises.

In event of objections to the fees and expenses claimed in this report the undersigned reserves the right to claim the usual contingent fee of 33⅓%.

The undersigned further offers and agrees, through his law firm or employees or agents to perform the necessary services to protect and secure to said Mills heirs the profits on which the above fees are fixed provided however that the advice in all matters pertaining to said premises of the undersigned is followed by said Mills heirs and provided further that the acceptance of this offer is made at the time of the submission of this report."

Defendant claims that a verbal agreement was entered into with the Mills heirs that for financing the purchase, clearing the title and making a sale of the property he was to receive from twenty-five per cent to fifty per cent of the difference between what the property would have brought at two thirds the appraised value and the amount that could be received for it on a subsequent sale, and in

his testimony in this respect he was corroborated to some extent by the somewhat indefinite testimony of his stenographer, and the letters he wrote before trouble arose between him and his clients, in which he referred to the matter as "our," indicating that he regarded himself as interested in some way in the profits. The three Mills heirs and the wife of one of them all denied entering into any contract with defendant other than the two contracts in writing hereinabove referred to. In their testimony answers were made more to leading questions than to statements of the respective parties, leaving conclusions to be drawn therefrom as to contractual relations somewhat in doubt. At least the evidence on that point was close, and, while we express no opinion on the sufficiency of the evidence to sustain a conviction, it was essential to a fair trial that defendant be given every opportunity to present all competent proof tending to support his defense.

Defendant was asked, "How much time did you devote to the Mills heirs' title to the land beginning December, 1940?" The prosecution objected on the ground that there was a written agreement. The trial court recognized that there was a controversy as to whether there was a subsequent contract, and as to whether defendant performed that part of the contract. Nevertheless the objection was sustained. This was error, as the amount and character of the service rendered might have tended to prove that such services could not have been within the contemplation of the parties when the small fee of $200 was agreed upon for looking into the case to protect the interest of Teel Mills. Furthermore it was corroborative of the understanding expressed in the letter from Ruth Mills's counsel, in which it was said: "We do not find that your fee was ever fixed and would suggest that you furnish us with an itemized statement showing just what you did for Miss Mills in the partition proceedings and advise us what you consider is a fair fee in that connection." When we con-

sider the various conflicting inferences that may be drawn from the different parts of evidence throughout this record in a more or less disconnected way, it is important that all the evidence bearing in any way on the issues should have been submitted to the jury. The gravamen of the offense charged was the conversion of property with a felonious intent. As intent may be proved by acts and circumstances, we must now pass to the question of whether any competent and material evidence was rejected which might have tended to disprove or to have raised a reasonable doubt as to defendant's felonious intent. Defendant offered to prove that if the Mills heirs had not refused to execute the required document, called an option, authorizing James Long, a real estate broker who was representing the Farm Security Association of the United States Government, to sell said property, a sale of the lands would have been made for $70,000, with a profit to each of the heirs. The court rejected this offer on the ground that proof of such an offer could be made only by some enforcible contract in writing signed by a party able to pay the purchase price and that the offer to prove a mere verbal offer or request for an option failed to meet such requirements. We do not think the rule applied by the court, which is the rule as between vendor and vendee, has any application in a criminal case wherein felonious intent is one of the issues. The offered proof might have tended to raise a reasonable doubt as to defendant's felonious intent and should have been admitted. Felonious intent must be proved beyond a reasonable doubt. (*People* v. *Munday,* 358 Ill. 470.) We cannot say that the jury could not reasonably have returned any other verdict than it did, if it had been permitted to consider the rejected testimony.

Certain objections have been made as to the instructions given. People's instruction No. 6 was approved by us as People's instruction No. 4 in the case of *People* v.

*Greben,* 352 Ill. 582. The cases cited by defendant were considered .by us in the attack made on this instruction in said case. ,

People's instruction No. 13 is the usual stock instruction on the weight to be given the testimony of the defendant and informs the jury that, in determining the degree of credibility to be accorded to his testimony, it may take into consideration the fact, if it be a fact, that he has been contradicted by other witnesses. The cases cited by defendant do not condemn the giving of such instruction. The most that can be gathered from them is that when such instruction is given, the defendant, upon request, is entitled to have the jury instructed that it may also consider whether the defendant has been corroborated by credible evidence. Here no such request was made by defendant. This instruction was held not to be erroneous in *People* v. *Meyer,* 289 Ill. 184, and in *People* v. *Snyder,* 279 Ill. 435.

Defendant's refused instruction No. 37 stated that the mere proof of the receipt of funds and the failure to account therefor is not sufficient in itself to show embezzlement by an agent or servant. The jury was fully advised by People's instruction No. 9 and defendant's instructions 23, 24 and 27, of all the essential elements necessary to be proved beyond a reasonable doubt before a conviction would be warranted. Defendant was not prejudiced by the refusal of this instruction.

Under the record presented we feel another trial, free from error, should be granted the defendant, with all the evidence before another jury, which will afford ample opportunity for a determination of the defendant's guilt or innocence.

For the errors above mentioned, the judgment of the circuit court is reversed and the cause is remanded.

*Reversed and remanded.*