**People of the State of Illinois, Plaintiff-Appellee, v. Leon Drew Stewart, Defendant-Appellant.**

**Gen. No. 49,613.**

First District, Fourth Division.

September 13, 1966.

Gerald W. Getty, Public Defender of Cook County, of Chicago (John M. Branion, Shelvin Singer and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, Carmen V. Speranza and

George Samels, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

CHARGE

Attempt (to commit rape).[1]

JUDGMENT

After a jury verdict finding defendant guilty, the court imposed a sentence of one to five years.

POINTS RAISED ON APPEAL

(1) The charge was not proved beyond a reasonable doubt.

(2) The State's Attorney made prejudicial remarks in argument.

(3) The court committed error in the giving of instructions to the jury.

EVIDENCE

**Testimony on Behalf of the State**

*Deloris White*

On the evening of January 3, 1963, she and two companions, Evelyn Coppage and Mary Clark, were walking

---

[1] Ill Rev Stats (1961), ch 38 includes:

§ 8–4. **Attempt**

(a) Elements of the Offense.

A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense.

(b) Impossibility.

It shall not be a defense to a charge of attempt that because of a misapprehension of the circumstances it would have been impossible for the accused to commit the offense attempted.

§ 11–1. **Rape**

(a) A male person of the age of 14 years and upwards who has sexual intercourse with a female, not his wife, by force and against her will, commits rape. . . .

east on the 59th Street bridge over the Dan Ryan Expressway. They were accosted by defendant who warned them not to move and not to "holler" or he would kill them with a gun. She saw the handle of a gun protruding from his coat. Defendant then walked the three girls to a dark and deserted ball park at 57th and Shields Streets where he told them to sit down on the ground. It was icy, muddy and dirty. Seeing that they were cold, defendant announced that he would kiss each girl to find out which was coldest and she would be "first."

After directing the girls to spread their coats on the ground, he selected Deloris and told her to take down her slacks and panties and lie down on the coats. He said, "Remember, I got a gun and don't try any funny business." She did as she was told. He pulled down his zipper and lay on top of her for what seemed like fifteen minutes, but was unable to achieve an erection. He then had her get up and told Evelyn to take her place after first pulling her skirt up and her tights down. He lay on top of Evelyn for a short time during which time he had his hand on the gun in his pocket. He kept saying, "Don't try no funny business."

They all got up and put on their coats and went under a viaduct where defendant said he was looking for a truck or car where they might lie down. Finding none, and with the gun in Deloris' back, they went into an apartment building hall, but a tenant there told them to get out.

Defendant then took them to a house and reminded them not to say anything because he had a gun. A teen-age boy let them in. Defendant introduced them to a woman in the house and had the girls take off their coats. Deloris did not yell; she was scared. She did not notice anyone laughing. They went to the basement where Deloris and Mary went to the washroom while defendant stayed with Evelyn. Defendant decided it was too cold in the basement. He had the girls go back up-

410

stairs, telling Evelyn and Mary to remain in the living room while he took Deloris to a bedroom on the second floor.

In the bedroom defendant had the gun in his hand and completely out of his pocket. He directed Deloris to disrobe from the waist down and get in bed, which she did. He then disrobed completely, and got in bed on top of her. She was crying, and asked him to let her go, telling him that she had kids at home. (Deloris had five children.) Intercourse was not realized, and, in addition, defendant was unsuccessful in attempting to force her to commit an act of oral copulation. At that time a man and woman came upstairs, and the woman said, "Leon, I am ashamed of you." Leon "got his pants" and "ran out." Deloris dressed and went downstairs where defendant told her not to report him to the police. Earlier the older woman said defendant had been in some trouble and she was so ashamed of him. Deloris took her coat and the coats of Evelyn and Mary and ran to a tavern at the corner where she found the other girls in the washroom. The young boy went with her to the door of the tavern, and on the way he said, "I don't know what is in him to do things like that." Two policemen came to the tavern and they all went back to the house, but they couldn't find defendant.

*Evelyn Coppage and Mary Clark*

They corroborated the testimony of Deloris White in all essential particulars, there being only very minor discrepancies.

As to the gun: Evelyn saw the handle only and defendant kept his hand on it a good bit of the time; Mary testified similarly, but said that he pulled it out of his pocket when he first met them on the bridge. Both said that he threatened them from time to time and said he would kill them, or if they got away he would kill Deloris. For this reason, and because they were scared, they did not yell or try to run away.

411

Mary estimated that defendant's efforts with Deloris in the ball park had lasted six or seven minutes, and with Evelyn about four minutes. Evelyn said five or ten, and one or two.

The two girls were in complete agreement that very shortly after defendant went to the bedroom with Deloris they ran out of the house to the tavern on the corner and called the police. They then waited in the washroom until someone told them the police had arrived.

*Charles Mandel*

He was a police officer who went to a tavern at 59th and Normal at about midnight on January 3, 1963, in response to a radio call. There he saw Deloris, Evelyn and Mary. Deloris and Evelyn were crying. He and his partner and the three girls then went about 150 feet up the street to the house where defendant lived. The policemen were joined by three other officers, and they searched the premises for defendant but did not find him. Mandel and his partner went back to the house about an hour and a half later. Defendant was not there.

*Alfred Faro*

He was a detective who was assigned to this case on January 3, 1963. In the course of his investigation he arrested defendant at his home on January 22, 1963. In the car en route to the police station, he asked defendant if he had been with the three girls and defendant said that he had. Asked whether he had a revolver, defendant said that he did not; that he "only had a toy pistol to scare them."

*Michael Carlo*

He was employed by the State. On January 22, 1963, in response to a telephone call from defendant's mother, he went to the home where she and defendant lived and she gave him a package which contained a gun. She did not tell him anything about the gun.

(After identification of the gun by this witness and by Deloris White, a toy revolver with a brown and white handle and a silver barrel was admitted into evidence.)

**Testimony on Behalf of the Defendant**

*Tyree Wilson, Jr.*

He was 16 years old and lived with his mother, step-father and grandmother in the same house with defendant, who was his uncle. He saw defendant and three girls come to the house on the evening of January 3, 1963. He had no conversation with any of them. He saw two of the girls leave, and his mother watched them go to the tavern. Later the other girl asked about her friends and his mother gave her their coats and told her they had gone to the tavern. At his mother's request he carried the coats and walked the girl over to the tavern door. Later they all came back with policemen. He denied that on the way to the tavern he had made any comment to the girl about defendant's behavior.

*Lucille Jones*

Sister of defendant and mother of Tyree, she was at home when defendant came home with the three young ladies. They went to another room where they sat talking and smoking. She went in there after five or ten minutes and was introduced to the girls. She then returned to the TV room where she could hear defendant and the girls in the other room laughing and talking for a half hour or so. After another half hour two of them left without their coats and she watched them go to the tavern on the corner. It was pretty cold that night, and she thought it was strange that they left without their coats.

About ten minutes later the third girl inquired about her friends. Mrs. Jones gave her their coats and had her son escort the lady to the tavern where they had gone. Five or ten minutes later the police came. They talked to Mrs. Jones' mother but did not search the house.

413

She heard defendant somewhere in the back of the house at the time, but she did not see him again that night. The girls said they had been raped.

Mrs. Jones denied that she and her husband had gone upstairs or that she had told defendant that he should be ,ashamed of himself.

*Rachel Faulkner*

She is defendant's mother. She was upstairs in their home and when she came down she saw her son and Deloris. They were talking in the TV room, and he introduced her to Deloris. After a few minutes Deloris left to go to meet her friends at the tavern. Mrs. Jones gave her their coats to take along.

When the police came Mrs. Faulkner and defendant were in the kitchen making coffee. She went to the door. The police said they had a complaint that some girls had been molested. (She made no reference to a search of the premises nor did she attempt to explain the inability of the police to find defendant.)

Mrs. Jones told the police that it couldn't have happened there because no one had left the downstairs room where they all were.

*Wilbur Jones*

Defendant's brother-in-law, he saw defendant come in with some ladies, but he was watching TV and did not come out and talk to them. They left after about half an hour. He didn't pay any attention to them. Two left first, without their coats. The third one left about ten minutes later and took the coats. His son went with her. About ten minutes later the girls came back with the police.

(It was stipulated that defendant is 39 years old.)

OPINION

■■ (1) The credibility of the witnesses is essentially a matter for the jury. There is evidence which establishes proof of defendant's guilt beyond a reason-

able doubt, and what inconsistencies exist are so minor as not to render it unworthy of belief. People v. Cole, 30 Ill2d 375, 196 NE2d 691.

■ The testimony of the three girls showed that defendant, with the requisite statutory intent, performed an "act" which constitutes a substantial step toward the commission of the crime of rape. Ill Rev Stats (1961), c 38, §§ 8-4, 11-1. There was proof of sufficient force or threat of force to overcome the victim's will (People v. Damen, 28 Ill2d 464, 193 NE2d 25; People v. Elder, 25 Ill2d 612, 186 NE2d 27) ; and under the circumstances resistance would have been dangerous and futile, and therefore not required (People v. Smith, 32 Ill2d 88, 203 NE2d 879; People v. Faulisi, 25 Ill2d 457, 185 NE 2d 211). In this view of the evidence, defendant's citations based on consent or lack of will to resist are not in point. People v. Scott, 407 Ill 301, 95 NE2d 315; People v. Serrielle, 354 Ill 182, 188 NE 375; Adams v. People, 179 Ill 633, 54 NE 296.

■ (2) Defendant's contention that the State's Attorney made prejudicial remarks in his closing argument relate to two comments: first, that defendant had fled after the crime, thus indicating guilt; and, second, that defendant's mother said he had been in trouble before. The objection to the first comment is that it is not supported by any evidence, and as to the second comment defendant says that it is not supported by evidence and was an improper attempt to prove a prior criminal record. When defense counsel made timely objections during the trial they were sustained by the trial court. A defense motion for a mistrial was denied, and properly so, in our opinion.

■ In fact, we find that both arguments were supported by the evidence; the State's Attorney made only proper comment thereon; and the defendant's objections to the argument should have been overruled. There was

testimony that when defendant and Deloris were seen in the bedroom, defendant "ran out," the police were unable to find him that night, and did not accomplish his arrest until almost three weeks later. There was also testimony that defendant's mother told Deloris that defendant had been in trouble and that she was ashamed of him.

(3) Defendant also argues that the court erred in giving an instruction on the subject of flight. There can be no question that a defendant's flight may be considered with other evidence as tending to prove guilt. People v. Rossini, 25 Ill2d 617, 621, 185 NE2d 831. And in a long line of cases it has been held that where there is evidence of flight, as there is in this case, an appropriately worded instruction is properly given by the court. People v. Lobb, 17 Ill2d 287, 295, 296, 161 NE2d 325; People v. Dukes, 12 Ill2d 334, 343, 146 NE2d 14. We therefore cannot find that the giving of an instruction on flight constituted error. In passing, however, we should like to make note of our belief that instructions of this type which single out a particular portion of the evidence [2] unquestionably give added and undue weight to the evidence in question by appearing to give it the approval of the court.[3]

---

[2] In People v. Henderson, 378 Ill 436, 448, 38 NE2d 727, the court said: "These two instructions were bad because they called the attention of the jury to particular facts in evidence (citation) and because particular portions of the evidence were singled out. (Citations.)" See also People v. Durand, 313 Ill 582, 586, 145 NE 162, and People v. Newbold, 178 Ill App 63, 65.

[3] Examples of other instructions of like kind, in our opinion, include those singling out the testimony of police officers, or instructing the jury that the testimony of an accomplice must be received cautiously and weighed with care. We consider such instructions to run counter in principle to the trend of modern thought on jury instructions generally. Inferences which may reasonably be drawn from facts in evidence, and matters reflect-

 Defendant also complains of the giving of an instruction which included the statutory definitions of the crimes of attempt and rape. The objection here is because the evidence had established that under the circumstances of this case defendant was apparently incapable of engaging in intercourse and therefore incapable of rape. The answer to this contention is found in the Criminal Code where it is stated: "It shall not be a defense to a charge of attempt that because of a misapprehension of the circumstances it would have been impossible for the accused to commit the offense attempted." Ill Rev Stats (1961), c 38, § 8–4(b).

DECISION

The judgment and sentence of the Circuit Court are affirmed.

Affirmed.

DRUCKER, P. J. and McCORMICK, J., concur.

---

ing on the credibility of a witness remain, of course, as proper subjects for the attorneys' argument to the jury.

With this footnote Justice McCormick does not agree. He believes, for example, that either "flight" or "accomplice" instructions (or both) should be given in cases where appropriate.