130 F.3d 523
 48 Fed. R. Evid. Serv. 273
 UNITED STATES of America, Appellee-Cross-Appellant,
v.
Thomas DOYLE, Defendant-Appellant-Cross-Appellee,
Robert Vance, Defendant-Appellant,
Umm Al Jawaby Oil Service Company Limited, ISP GmbH, Camarco
International, Ltd., Montese Supplies, International General
Trade, International Car Supply Material Corporation Limited
and International Management Systems, Inc., Defendants.
 Nos. 1352, 1353, 1601, Dockets 96-1542, 96-1552, 96-1565.
 United States Court of Appeals,
Second Circuit.
 Argued April 24, 1997.
Decided Dec. 4, 1997.
 
 Andrew B. Bowman, Westport, CT, for Defendant-Appellant-Cross-Appellee Thomas Doyle.
 David T. Grudberg, New Haven, CT (Ira B. Grudberg, Jacobs, Grudberg, Belt & Dow, P.C., of counsel), for Defendant-Appellant Robert Vance.
 Robert M. Appleton, Assistant United States Attorney, Bridgeport, CT (John H. Durham, Acting United States Attorney, of counsel), for Appellee-Cross-Appellant.
 Before OAKES and JACOBS, Circuit Judges, and STEIN, District Judge.*
 OAKES, Senior Circuit Judge:
 
 
 1
 Thomas Doyle and Robert Vance appeal from judgments of conviction entered on February 6, 1996, in the United States District Court for the District of Connecticut, Alfred V. Covello, Judge, following a seven-day jury trial. Doyle and Vance were convicted on six counts relating to the illegal exportation of technological parts and conspiracy to commit such illegal exportation, as well as the filing of false statements in export documents. The court sentenced appellants on July 31, 1996: Doyle received a sentence of fifteen months' imprisonment, three years' supervised release, and a $5,000 fine; Vance was sentenced to a five-month term of imprisonment, to be followed by a three-year term of supervised release with certain special conditions, including five months' home confinement.
 
 
 2
 Appellants Doyle and Vance jointly bring four assertions of error. First, they assert that the records generated by the Republic of Malta and admitted by the district court as "foreign public documents" contain inadmissible hearsay, the admission of which deprived them of their Sixth Amendment right to confrontation. Second, they claim that the district court's refusal to admit into evidence the deposition of a co-conspirator, Wolfgang Nothacker, deprived them of their Fifth Amendment right to Due Process and Sixth Amendment right to present a defense. Third, they argue that the court erroneously refused to charge the jury on evidence of habit relating to the defendants' fifteen-year practice of describing their shipments from Connecticut to Germany as "auto spares." Finally, they maintain that the court committed reversible error by instructing the jury that the reasonable doubt standard and the presumption of innocence were rules "designed to protect the innocent and not the guilty."
 
 
 3
 Doyle also brings two independent assertions of error: first, he claims a deprivation of his Fifth and Sixth Amendment rights by virtue of the court's refusal to permit him to subpoena U.S. Army Intelligence agents for whom Doyle worked during the time of the conspiracy, and its exclusion of trial testimony relating to specific actions Doyle asserts he took against Libya in order to promote U.S. national security; second, he argues that the court effectively refused to charge the jury on his good faith theory of defense.
 
 
 4
 Although we reject the majority of these arguments, we agree that at least some of the documents submitted to the Maltese government by private shipping companies constituted inadmissible hearsay and were improperly admitted at trial. We also hold that the district court's charge to the jury regarding reasonable doubt and the presumption of innocence was erroneous. We therefore reverse and remand for a new trial.
 
 
 5
 * Facts
 
 
 6
 The following facts are based upon the evidence developed at appellants' trial. Upon retrial, of course, the evidence and verdict may be different. For purposes of the appeal, however, we accept the facts in the light most favorable to the Government, United States v. Wooden, 61 F.3d 3, 5 (2d Cir.1995), and note that appellants do not contest the sufficiency of the evidence.
 
 A. Background
 
 7
 In January, 1986, the President of the United States, by Executive Order, prohibited U.S. trade with Libya. Exec. Order No. 12,543, 51 Fed.Reg. 875 (1986). The embargo prohibited the shipment and export of any goods, technology, or services[1] to Libya. Id. at § 1(b). Despite the American embargo, Zueitina Oil Company ("ZOC"), the national oil company of the Republic of Libya, continued to seek U.S.-made oil field spare parts for American technology which had been obtained prior to the embargo. On July 21, 1986, a ZOC officer generated an interoffice memorandum in Libya directing Umm Al Jawaby, its purchasing agent, to obtain Lead Romac/Seiglar gear-type fuel pumps ("LRS pumps") as spare parts for use in the land-based solar turbine engines operating in the Libyan oil fields. The memorandum acknowledged that, because of the American embargo, the fuel pumps were difficult to obtain. The spare parts were, however, necessary because the pumps ZOC was then using were malfunctioning due in part to the type of fuel being utilized. ZOC thus sought pumps which would work on a higher percentage of naphtha fuel. Umm Al Jawaby was instructed to devote its full attention to the procurement of LRS pumps.
 
 
 8
 Camarco International Limited ("Camarco") was a company located in the Republic of Malta, whose principal officers were Joe Bonello and Paul Hili. On June 2, 1988, Bonello placed a purchase order on behalf of Camarco for fifty LRS pumps with International Spare Parts GmbH ("ISP"), a West German company located in Koenigstein, Germany, and operated by Wolfgang Nothacker, a German national. The pumps were intended for ZOC, and delivery was intended for Tripoli, Libya.
 
 
 9
 Thomas Doyle conducted business operations at 1034 Prospect Road, Cheshire, Connecticut, which included those of five closely-held companies established by Doyle: International Management Systems ("IMS"), International Car Supply Material Corporation ("ICS"), International Spare Parts, Cheshire Aircraft Supply, and Brooksvale Construction Corporation. Doyle and all five of his companies were primarily involved in the export of U.S.-made goods, and conducted all of their export business with ISP. Nothacker, Rainer Martin, and Doyle were the principals of ICS. Like Nothacker, Martin was a German national, worked in Koenigstein, Germany, and was associated with ISP.
 
 
 10
 During the time covered by the charges in the indictment, Doyle received almost daily facsimile transmissions from ISP, Nothacker, or Martin. In these facsimiles, Nothacker and Martin requested that Doyle obtain price and availability information for various U.S.-made goods, including automobile spare parts, truck parts, heavy equipment parts, electronics, aircraft parts, and, most critically to this case, oil field equipment.
 
 
 11
 In 1986, Doyle hired Richard Bowden as an expert in the automobile spare parts aspect of Doyle's business. When that business closed in 1987, Doyle moved Bowden to the export side of the business, where he worked under Doyle's direction until 1990. In Bowden's trial testimony, given under a grant of immunity, he testified that Martin and Nothacker would fax numerous requests for American goods to Doyle. After receiving the faxes, Bowden and Doyle contacted vendors in the United States to "source" the products--"sourcing" including the obtaining of price and availability information on the products. Once Bowden or Doyle obtained such information, it was relayed back to the Germans by fax. If ISP agreed to the terms of the quotation given by a manufacturer, they faxed Doyle a purchase order, and instructed him to purchase the product.
 
 
 12
 Bowden testified that goods procured domestically for ISP were shipped to them every Friday by a freight forwarder, frequently EMO Transportation, Incorporated ("EMO"), which operated at Bradley International Airport in Windsor Locks, Connecticut. At Doyle's instruction, Bowden completed the export documentation which accompanied the shipments, including the shipper's letter of instruction and the Shipper's Export Declaration ("SED"). Between 1987 and 1990, Doyle, significantly, instructed Bowden to describe the oil field equipment shipped to ISP on the documentation as "auto spares." Doyle further instructed Bowden to code with a color stamp those boxes destined for points beyond ISP's plant in Koenigstein, Germany. Doyle also directed that the letter "B" be placed in the export documentation as a suffix to describe those shipments destined for points beyond ISP in Germany. The items actually intended for delivery to ISP were marked with the suffix "A." Despite these coded notations, ISP was always described on the documentation as the ultimate consignee for the shipments. Doyle instructed Bowden to sign the forms filled out in this manner.
 
 
 13
 Bowden testified that some of the manufacturers he contacted as a result of a request by ISP were Turbo Power & Marine ("Turbo Power") in West Palm Beach, Florida; Hamilton Standard; Boeing; and McDonnell Douglas. Bowden contacted Turbo Power on numerous occasions. On many occasions that supplier, before it would agree to sell the part, would request the serial number of the piece of equipment for which the part was to be used. On one occasion, Bowden received a fax from ISP which described the desired product's ultimate point of delivery as "Libya." Bowden attempted to procure the part from Turbo Power, which refused to sell the part, or even offer a quote on the item, to Bowden because of this alert. When Bowden informed Doyle of this, Doyle told Bowden to include that information on the daily fax transmission to ISP. Immediately thereafter, an identical request for the procurement of the same product, albeit with the word "Libya" redacted, was received from ISP by fax. When Bowden showed the fax to Doyle, Doyle told Bowden that he would handle the file himself. Doyle proceeded to procure the part, sign the export documentation, and ship it to ISP in Germany. Doyle explained to Bowden that "we in fact were not doing business with the Libyans, we were only doing business with ISP, and that was the extent of our business, and therefore what happened to the items after we shipped them to Germany was not under our control and not our concern." Doyle further told Bowden that "the business people in West Germany did not view the Libyans in the same light we did and that, in fact, there was no trade embargo between West Germany and Libya."
 
 
 14
 In 1987 and 1988 Doyle contacted Edward Lewis at Mazzella Wire & Cable Company in North Haven, Connecticut, to procure oil field equipment. Doyle and Lewis thereafter maintained a business relationship in the course of which Lewis attempted to find, price, and obtain pieces of oil field equipment for Doyle. Prior to Lewis's 1989 departure from Connecticut to return to Texas, Lewis met Doyle at his place of business in Cheshire, and they agreed to continue their business relationship; the relationship did in fact continue. At that time, some of the companies Lewis contacted to procure parts for Doyle included Cameron and Texas Iron Works, Wellsley Supply, and National Oil Company. On a number of occasion, Lewis told Doyle that Cameron Iron Works refused to sell oil field equipment to Lewis because the company suspected that the parts were destined for Libya. On occasion, Doyle told Lewis to tell the company that the piece of equipment was going to Germany. On other occasions, Doyle asked Lewis whether another manufacturer produced that piece of equipment.
 
 
 15
 On January 25, 1990, Doyle asked Lewis to obtain oil pump repair "kits." Lewis contacted Cooper Industries to obtain the parts. Lewis asked the company for ninety-six pieces of the rebuilding kit, and provided the serial number for the piece of equipment for which the kit was to be used. Lewis told Doyle that the company refused to quote a price for the part because it was for a piece of equipment located in Libya, and faxed Doyle a letter to that effect. Lewis continued to attempt to obtain pieces of equipment for Doyle at Doyle's request. On many occasions, Lewis told Doyle that the manufacturer wanted to know the destination for the piece of equipment. In a majority of instances, Doyle told Lewis to tell the manufacturer that the part was going to Germany; the manufacturer would, however, continue to refuse to quote a price for the product.
 
 
 16
 Doyle personally contacted various U.S. manufacturers to obtain oil field parts and equipment. In April of 1987, Doyle contacted Turbo Power to purchase turbine blades used in oil producing machines, and spoke to Al Baumler, Turbo's regional sales manager. Based on the type of part, its part number and the desired quantity, Baumler knew that the part was bound for an oil field engine in Libya. Baumler told Doyle that he would have to report Doyle's order to U.S. Customs, to which Doyle responded, "[y]ou don't have to do that ... I won't pursue it any further." In June of 1987, Doyle again contacted Turbo Power seeking to procure 200 "nozzles." The order was taken by John McCleary, another Turbo Power sales representative. When Baumler recognized Doyle's order in the computer, he telephoned Doyle. Once again, based upon the nature of the piece of equipment Doyle sought, Baumler told Doyle that he suspected that the parts were destined for Libya, and that he would notify Customs. Doyle again canceled the order.
 
 
 17
 In July of 1988, Doyle sought to purchase LRS pumps, which were of the same nature sought by ZOC in its April, 1988, purchase order. Doyle telephoned Lead Seiglar Incorporated in Stamford, Connecticut, and submitted a purchase request for the pumps with sales representative James Riviello. After Doyle placed his order, Riviello asked Doyle where the pumps were going; Doyle responded Munich, Germany, and indicated that the pumps were for oil drilling purposes. Riviello expressed his concern that the pumps were destined for Libya. Riviello then contacted the U.S. Customs Service at JFK Airport about Doyle's order and told Doyle of the contact. Doyle told Riviello that "he didn't want to get involved with Libya" and canceled the order. Doyle faxed a letter to Nothacker in Germany in which he referenced his conversation with Riviello, and stated that "the manufacturer knows Libya is trying to buy" the pumps. Thereafter, Doyle and Nothacker attempted to obtain a false end user certificate representing that the pumps were destined for a permissible location.
 
 
 18
 Immediately thereafter, Doyle contacted his brother-in-law, J. Spencer Gould, at IMO Industries Incorporated ("IMO") in Cleveland, Ohio, to purchase the LRS pumps. At the time, IMO was the only other domestic manufacturer of this type of fuel pump. Gould, a director of IMO, vouched for Doyle's credibility and persuaded IMO employees to work with Doyle.[2] Doyle purchased fifty fuel pumps in October, 1989, of which twenty-seven were shipped to ISP at Doyle's request on December 23, 1989. ISP's business records contained an export document which reflected that those pumps were shipped to ZOC in Tripoli a week later. Doyle professed that the pumps were intended for shipment to a customer in Saudi Arabia, and on numerous occasions throughout the timeframe of the indictment stated that his customer was Mobil Oil. Mobil Oil, however, never purchased any pumps from Doyle, ISP, or Camarco at any relevant time. According to a document contained in ISP's business records, the pumps were intended to be shipped to ZOC in Tripoli on December 26, 1989.[3] Doyle's business files contained a letter from Camarco to Martin at ISP which referenced ZOC and indicated that ZOC had tested the pumps.
 
 
 19
 Robert Vance, Doyle's nephew, came to work at Doyle's business premises in Cheshire in 1990. On January 30, 1991, Camarco placed another purchase order with ISP for twelve fuel pumps to be delivered to ZOC in Tripoli. The order represented that seven of the pumps were to be hand-carried to Tripoli by February 1, 1991, and the remaining five were to be shipped no later than April 16, 1991. On January 18, 1991, Doyle purchased seven fuel pumps from IMO for $349 each. The pumps were shipped by IMO at Doyle's direction to his business address in Cheshire. Doyle and Vance then shipped the pumps to ISP in Germany on January 23, 1991; Vance described the pumps on the SED as "auto spares." They were then transshipped to Camarco in Malta on January 29, 1991. On February 1, 1991, the pumps were shipped to Tripoli.
 
 
 20
 On April 1, 1991, Doyle purchased an additional five pumps from IMO. Doyle and Vance shipped the pumps to ISP, again describing them on the SED as "auto spares."ISP requested that Doyle procure additional quantities of oil field technology throughout 1991. In the fall of 1991, Martin placed a purchase order with ICS and asked Vance to procure certain oil field spare parts. In mid-October of 1991, Vance contacted Philadelphia Gear Corporation in Philadelphia. On January 17, 1992, Vance placed the order with Philadelphia Gear. Joe Pooler, a credit manager for Philadelphia Gear, examined the purchase order and realized the spare parts were replacement parts for a piece of equipment that was located in Libya. Pooler contacted Vance and informed him that he suspected the parts Vance sought to procure were for shipment to Libya. Vance told Pooler that the parts were going to Iran.[4] Pooler told Vance to provide him with an "end user certificate, which is usually certification that the material is going to the party that your customer states that it was going to." Vance then faxed Martin a letter which stated that Philadelphia Gear would proceed with the order if they received a certified memo that the part was going to Iran and not Libya. Pooler testified at trial that he never received any such certification. Pooler later attempted to contact Vance; Vance never responded. Pooler then canceled the order based upon his suspicions that the parts were destined for Libya. Shortly thereafter, Vance attempted to procure the part from another source, and told ISP that he could obtain the parts from this second source.
 
 
 21
 On December 20, 1991, Mediterranean Oil Services GmbH ("MedOil") placed an order with ISP for, among other things, twenty hydraulic pneumatic interface valves manufactured by Baker, a U.S. company. Under the terms of the order, the valves were to be delivered by February 29, 1992, to Tripoli. ISP accepted the order. In January of 1992, Doyle contacted Lewis and asked him to procure the valves in the United States. By this time, Lewis had contacted the FBI and U.S. Customs Service based upon his concerns that Doyle's export practices involved shipments to embargoed destinations. Lewis agreed to cooperate with Customs in its investigation. Under the control of the agents, Lewis procured the valves. On March 13, 1992, Lewis traveled to Connecticut to deliver the valves to Doyle and Vance. Lewis delivered the valves to Doyle's business premises, although Doyle and Vance were not present at that time. Lewis spoke with Vance the next day, March 14, 1992. The conversation was consensually monitored and recorded. During the conversation, Vance acknowledged his participation with Doyle in procuring and exporting U.S.-made products for shipment to Libya. In the conversation, Vance described the process by which Doyle and Vance concealed their activities. Vance explained that they would seek "end user certificates" that falsely represented that the products were going to an approved destination. Vance also explained that by shipping the products through various middlemen and obtaining documentation which reflected a destination other than Libya, Doyle and Vance "insulated" themselves.[5]
 
 
 22
 On March 20, 1992, Special Agent David Conboy of U.S. Customs inspected Doyle's shipment, and found the valves contained in four boxes. Vance had signed the export control documentation and misdescribed the valves as "auto parts" with a value of $13,000; he further misrepresented on the documentation that the ultimate point of shipment was Germany. On April 6, 1992, ISP shipped the valves to Tripoli.
 
 
 23
 On October 6, 1992, Lewis, under the direction of the U.S. Customs agents, spoke with Doyle about oil field pipe for shipment to Libya. The conversation further significantly portrays Doyle's willingness to facilitate trade to Libya, through Martin at ISP in Germany, and will not be repeated here.
 
 
 24
 On October 30, 1992, Doyle attempted to ship to Malta certain gaskets, which were oil field equipment spare parts. The gaskets, again, were misdescribed as "auto spares" on the export documentation. The shipment was presented to EMO for shipment to Malta. Peter Leu, an EMO employee who handled much of Doyle's exports to ISP in Germany, spoke with Doyle concerning the shipment. Leu told Doyle that the shipment was being detained by U.S. Customs, to which Doyle responded that there were no problems with the shipments. Leu told Doyle that he had been advised that Malta was a point of transshipment for embargoed destinations, including Libya. Leu then called Customs. On that day, Doyle faxed to Martin at ISP in Germany a letter referencing his contact with Leu and indicating the latter's awareness that the shipment was destined for Libya.
 
 
 25
 Special Agent Conboy inspected the shipment at Bradley Airport and determined that Doyle and Vance were not shipping automobile spare parts but, rather, gaskets for an industrial engine. Agent Conboy also inspected Doyle's other shipments bound for Malta, and determined that five fuel pumps described on the export documentation as "auto spares" were bound for export to Malta. Vance had again signed the export control documentation. Agent Conboy alerted U.S. Customs officials overseas of the shipment of the pumps. The shipment was intercepted in Malta and seized by U.S. Customs agents, and the pumps were returned to the United States.
 
 
 26
 In August, 1992, Doyle purchased an additional fifty pumps from IMO at ISP's direction, two of which were shipped by IMO to Malta on September 9, 1992. On November 12, 1992, an IMO representative spoke with Vance concerning the two pumps that had been shipped on September 9. Vance told him that the pumps had been seized in Malta en route to Libya. When the IMO representative asked Vance to confirm that the pumps were en route to Libya, Vance replied that he wasn't sure, and he would have Doyle call him. Approximately five days later the representative spoke with Doyle and asked whether the pumps had been seized, to which Doyle replied in the negative and further denied that the pumps were being shipped to Libya.
 
 
 27
 On November 20, 1992, Doyle and Vance shipped twenty-two pumps to ISP in Germany. Agent Conboy inspected the outbound shipment at Bradley Airport and confirmed that the shipment contained fuel pumps, although the export documentation completed by Vance falsely described the contents as "auto spares," with an ultimate destination of Germany. Documentation received through the issuance of letters rogatory to the Republic of Malta demonstrated that four of the pumps shipped were transshipped to Montese Supplies Limited ("Montese"), a subsidiary of Camarco, in the Republic of Malta through ISP in Germany on December 5, 1992. On December 7, 1992, the four pumps were hand-carried to Tripoli.
 
 
 28
 In November and December, 1992, aware of the Customs investigation, Doyle generated a number of self-serving letters which he faxed to ISP in Germany claiming that he never had knowledge of the destination of the fuel pumps. Doyle asked the Germans to provide him with end user information. At Doyle's request, Martin faxed Doyle a letter which indicated that the end user of the pump was Moda Corporation in Riyadh, Saudi Arabia.
 
 
 29
 In August, 1993, Doyle contacted the Perry Equipment Corporation ("Perry") in Texas to obtain "filters." Judy Wampler, a Perry sales representative, spoke to Doyle at that time. Wampler realized that Doyle was associated with an export house and, pursuant to company policy, asked Doyle to provide the destination of the equipment. Doyle contacted Wampler shortly thereafter and told her that the parts were destined for Libya. Wampler told Doyle that it was against her company policy to ship to an embargoed country, and canceled the order.
 
 
 30
 Prior to the indictment in this case, the Government requested, and the district court issued, international letters rogatory in connection with the investigation. One letter was issued to the Republic of Malta on May 28, 1993, by Chief United States District Judge Peter C. Dorsey. The letter rogatory requested, among other things, official records of the government of Malta concerning the shipments by the defendants of fuel pumps to ZOC. The letter rogatory was executed and forwarded to the appropriate government officials in the Republic of Malta. On December 1, 1993, Republic of Malta Deputy Attorney General Dr. Degaetano signed and certified as authentic numerous public documents of the Customs agency of Malta. The Government asserts that those documents which it offered at trial were generated in or collected by the Malta Customs agency in its official capacity. Further appended to the submission is a sworn statement of authenticity executed by Senior Malta Customs Inspector John Cauchi, sworn to under oath before Magistrate Dr. David Scicluna, and certification from the Assistant Attorney General of Malta. Finally, the United States Consul in the Republic of Malta certified that he received the letter rogatory and accompanying documents on December 10, 1993.
 
 
 31
 On September 7, 1994, Nothacker and Martin voluntarily agreed to be interviewed by the Government in the presence of counsel under the terms of a proffer agreement. The interview was conducted by a special agent of the U.S. Customs Service and Robert M. Appleton, Assistant U.S. Attorney for the District of Connecticut and counsel of record for Appellee. Neither Nothacker nor Martin, both of whom were represented by counsel during the entire course of the interview, was placed under oath prior to making statements. The statements were transcribed at the request of counsel.
 
 
 32
 In October of 1994, indictment on six counts was filed against Doyle and Vance. Count One charged Doyle, Vance, ISP, Camarco, Montese, Umm Al Jawaby, and various companies operated at Doyle's business premises in Cheshire, Connecticut, with conspiracy to 1) export and attempt to export United States-made technological parts and equipment to Libya, through Germany and, at times, the Republic of Malta, and 2) submit and cause the submission of false export control documents in connection with the shipments of the parts and technology. Counts Two and Three charged Doyle, Vance, and Doyle's business entities with knowingly and willfully exporting and attempting to export United States made technological parts and equipment to Germany, for eventual transshipment to Libya through the Republic of Malta in violation of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701, 1702, and 1705(b); 31 C.F.R. §§ 550.202, 550.205, 550.208-.209, and 550.409; and causing such exports in violation of 18 U.S.C. § 2. Counts Four, Five, and Six charged Doyle and Vance with knowingly and willfully making, and causing to be made, false statements on export control documents concerning the nature of the shipments, their value and destination, in violation of the Export Administration Act, 50 U.S.C.App. § 2410(a); 50 U.S.C. §§ 1701, 1702, and 1705(b); 15 C.F.R. §§ 787.2, and 787.5; and Exec. Orders 12,543, 12,544, and 12,730.
 
 
 33
 On January 23, 1996, ISP pled guilty to Count Two of the indictment and agreed to pay a $70,000 fine. Under the terms of the agreement, Nothacker was advised that the U.S. Attorney's Office for the District of Connecticut would recommend to the U.S. Department of Commerce that ISP and Nothacker be denied all export privileges of participating directly and indirectly in any manner or capacity, in any transaction in the United States or abroad involving any commodity exported from the United States for a period of ten years. Nothacker agreed not to oppose any ban placed upon him or ISP by the Commerce Department. ISP and Nothacker further agreed to cooperate with the Government by providing any and all documents within their possession concerning the activity which formed the basis of the indictment. The plea agreement provided that it would become null and void if Nothacker or ISP failed to provide, or altered, redacted, or destroyed any such documents. Nothacker executed a certificate of authenticity with respect to the documents he provided to the Government.
 
 
 34
 On January 12, 1996, Nothacker and the Government entered into a stipulation of facts concerning the circumstances underlying the transactions in this case in connection with the corporate plea. The stipulation was appended to and made part of the plea agreement between the Government and ISP filed in the U.S. District Court in Hartford. In the stipulation of facts, Nothacker acknowledged Doyle's participation in the offense. Nothacker further represented that he previously made misleading statements to the Government about the circumstances of the shipments. Nothacker agreed that the stipulation of facts appended to the plea agreement, which he signed under penalties of perjury and making a false statement, "accurately sets the stage for some of the conduct which gives rise to the indictment in this case...."
 
 
 35
 The trial against the remaining defendants commenced January 24, 1996; the jury returned its verdict on February 6, 1996. Doyle and Vance were convicted on all counts. On July 31, 1996, the court sentenced Doyle to fifteen months' imprisonment, three years' supervised release, and a $5,000 fine; and Vance to a five-month term of imprisonment in a halfway house, followed by a three-year term of supervised release with special conditions, including five months' home confinement. Both Doyle and Vance remain free on bond pending appeal.
 
 II
 Discussion
 A. Jury Instructions
 
 36
 1. Charge--Reasonable Doubt/Presumption of Innocence
 
 
 37
 Because the ground of our reversal and remand for a new trial is the following instruction, we discuss it first. We follow with reference to the other points made by the parties, in order to assist the trial court on remand.
 
 
 38
 When charging the jury, the court gave this instruction:
 
 
 39
 I want to remind you again that it's the sworn duty of the courts and the jurors to safeguard the rights of persons charged with crimes by respecting the presumption of innocence which the law imputes to every person so charged and by making the government meet its burden of proving guilt beyond a reasonable doubt. You must keep in mind that those rules of law are designed to protect the innocent and not the guilty. If and when the presumption of innocence has been overcome by evidence proving beyond a reasonable doubt that the accused is guilty of the crime charged, then it's your sworn duty to enforce the law and render a verdict of guilty.
 
 
 40
 (emphasis added). Appellants jointly assert that this is a misstatement of the law which improperly dilutes the presumption of innocence and the reasonable doubt standard. We agree.
 
 
 41
 This court has three times previously addressed similar charges. See United States v. Ciak, 102 F.3d 38, 45-46 (2d Cir.1996) (challenge based on both reasonable doubt and presumption of innocence); United States v. Bifield, 702 F.2d 342, 350-51 (2d Cir.1983) (challenge based only upon presumption of innocence); United States v. Farina, 184 F.2d 18 (2d Cir.1950) (both). Although we upheld the convictions in all three cases, our affirmances were not given without reservations. In Farina, the first case, Judge Augustus Hand found that, overall:
 
 
 42
 "the[ ] instructions were so clear and explicit, that any generalization indulged in by the judge to the effect that the presumption was not intended as a bulwark behind which the guilty might hide could not ... mislead the jury regarding the duty of the Government to go forward with convincing proof before a verdict of guilty could properly be rendered.
 
 
 43
 184 F.2d at 21.[6] In dissent, however, Judge Frank found that the instruction might "easily have misled the jury, to the grave prejudice of the accused." Farina, 184 F.2d at 22-23 (Frank, J., dissenting). In Bifield, while noting that "this is a close question," Judge Cardamone wrote, "[T]he instructions ... when read in their entirety, were sufficiently clear so as not to dilute the presumption of innocence to which appellant is entitled." 702 F.2d at 351.[7] The opinion did, however, firmly state, perhaps as instruction to the district courts, that "it is better practice to avoid using language to the effect that the law is made to protect the innocent and not the guilty." Id. Most recently, Ciak affirmed a conviction in which the district court had given a charge identical to that before us on appeal.[8] Judge Cabranes's opinion interpreted Bifield to hold that the charge should not be reversed if, in its entirety, it "sufficiently mitigated any harm resulting from the challenged language" by both stating " 'specifically and repeatedly that [the defendant] was innocent when presented for trial and continued to be innocent until such time, if ever, as the government proved his guilt beyond a reasonable doubt,' " and by " 'stress[ing] that [the defendant] [does] not have to prove his innocence, but rather ... the government ha[s] to prove his guilt.' " Ciak, 102 F.3d at 45 (quoting Bifield, 702 F.2d at 351). Because the Ciak charge "matche[d] almost verbatim" the instruction which had been affirmed in Bifield, Judge Cabranes reasoned that it must likewise have "sufficiently mitigated" any harm. The panel thus found no plain error. Id. at 46. Yet, again, and we think this significant, Ciak made a point of repeating the Bifield caution that "it is better practice to avoid using [such] language." Id. at 45.
 
 
 44
 The jury charges in both Ciak and Farina were evaluated under the extremely deferential "plain error" standard of review because in both cases, and we emphasize this with the strongest possible shading, both defense attorneys had failed to make timely objection. See Ciak, 102 F.3d at 45; Farina, 184 F.2d at 20. Here, Doyle's counsel made immediate objection. Because of that objection, the "plain error" standards of Fed.R.Crim.P. 52(b) are inapplicable, and on the issue of law raised by counsel's objection our review is de novo. See Anderson v. Branen, 17 F.3d 552, 556 (2d Cir.1994). We do not know whether the Bifield appeal was brought following timely objection, but note that the panel had grave doubts about the propriety of the instruction in question, explicitly discouraged its use, and referred to the matter as a "close question." Bifield, 702 F.2d at 351. Furthermore, Bifield addressed only the aspect of the presumption of innocence, and not the effect of the charge upon the reasonable doubt standard. For our purposes, this is a critical distinction: the Supreme Court has provided new and definitive guidance reinforcing the importance of the reasonable doubt standard in the years since Bifield. For these reasons, we take a fresh look at whether this instruction violates a criminal defendant's rights to the presumption of innocence and to have his guilt established by the Government beyond a reasonable doubt, while keeping in mind our repeated disapproval of the instruction in question in the past.
 
 
 45
 "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of our criminal law." Coffin v. United States, 156 U.S. 432, 453, 15 S.Ct. 394, 403, 39 L.Ed. 481 (1895). This presumption "is a basic component of a fair trial," Estelle v. Williams, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976), and derives from the Due Process Clauses under the Fifth and Fourteenth Amendments of the Constitution, Taylor v. Kentucky, 436 U.S. 478, 485-86 n. 13, 98 S.Ct. 1930, 1935 n. 13, 56 L.Ed.2d 468 (1978). Likewise, requiring the Government to carry the heavy burden of proving a defendant guilty beyond a reasonable doubt is sacrosanct law and derives from the Due Process Clause. In re Winship, 397 U.S. 358, 361-64, 90 S.Ct. 1068, 1071-73, 25 L.Ed.2d 368 (1970) (conviction requires proof beyond a reasonable doubt of every fact necessary to constitute the crime charged). See also, Jackson v. Virginia, 443 U.S. 307, 313-16, 99 S.Ct. 2781, 2786-87, 61 L.Ed.2d 560 (1979) (habeas petition following state conviction) (proof beyond a reasonable doubt must be established for every element of the crime charged). Winship made clear that the reasonable doubt standard is the means by which the presumption of innocence is implemented. 397 U.S. at 363, 90 S.Ct. at 1072.[9] Because our system entrusts the jury with the primary responsibility of implementing the substantive protections promised by the reasonable doubt standard, reasonable doubt jury instructions which appropriately convey Winship concepts are critical to the constitutionality of a conviction. See, e.g., Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Similarly, the Court has recognized that "an instruction on the presumption [of innocence] is one way of impressing upon the jury the importance of that right." Taylor, 436 U.S. at 485, 98 S.Ct. at 1935 (collecting cases).[10] The case at bar thus squarely implicates both principles of law.
 
 
 46
 While it may not always be erroneous to fail to give an instruction, a charge which is given must be correct. De novo review leads us to a finding of error if we conclude that a charge either fails to adequately inform the jury of the law, or misleads the jury as to a correct legal standard. Anderson, 17 F.3d at 556; see also, Norfleet v. Isthmian Lines, Inc., 355 F.2d 359, 362-63 (2d Cir.1966) (jury charge must show no tendency to confuse or mislead jury as to applicable principles of law). Here, we look specifically at the standard attaching to judicial review of reasonable doubt jury instructions, which has fluctuated somewhat over the last 20 years. See United States v. Birbal, 62 F.3d 456, 461-63 (1995). The Cage Court proclaimed that the standard was a search for "how reasonable jurors could have understood the charge as a whole." 498 U.S. at 41, 111 S.Ct. at 330 (emphasis added). In Boyde v. California, 494 U.S. 370, 378-80, 110 S.Ct. 1190, 1197-98, 108 L.Ed.2d 316 (1990), the Court noted that numerous standards were in use by it and lower courts of appeals, and adopted a new standard--whether there is a "reasonable likelihood" that the jury misunderstood and unconstitutionally applied the instruction. Boyde explained that under this reasonable likelihood standard "a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction," although the standard requires more than "a possibility of such an inhibition." Id. at 380, 110 S.Ct. at 1198. This standard was reiterated by the Court in Estelle v. McGuire, 502 U.S. 62, 72-73 n. 4, 112 S.Ct. 475, 482 n. 4, 116 L.Ed.2d 385 (1991) (expressly overturning the Cage standard and embracing Boyde ), and in Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994). Although the "reasonable likelihood" standard bears a surface resemblance to "harmless error" review in that it requires inquiry into the effect of the erroneous instruction upon the jury, Justice Scalia stated for the Court in Sullivan v. Louisiana, 508 U.S. 275, 278-82, 113 S.Ct. 2078, 2081-83, 124 L.Ed.2d 182 (1993), that "harmless error" review is not pertinent to judicial scrutiny of an erroneous reasonable doubt instruction, because error in this essential instruction is per se harmful and must result in an overturning of conviction.
 
 
 47
 In other words, then, we do not engage in an inquiry of harmless error review such as was enunciated in Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), which looked at the case in its entirety to analyze the effect of the error on the jury's verdict. Rather, we assess only the charge, taken as a whole, in order to determine whether there is a reasonable likelihood that the jury misinterpreted the reasonable doubt instruction. Cf. United States v. Birbal, 62 F.3d 456, 461-62 (2d Cir.1995) (under plain error standard, question on appeal is "whether, taking the jury instructions as a whole, there is a 'reasonable likelihood' that the jury understood the instructions to allow conviction based on insufficient proof"). Here, therefore, we need only decide whether there is a reasonable likelihood that the jury misunderstood the reasonable doubt standard.
 
 
 48
 We first examine the jurisprudence of our sister courts on the matter of similar charges. We have found only one circuit court opinion wholeheartedly approving of an instruction like the one given in this instance. In Moffitt v. United States, 154 F.2d 402 (10th Cir.1946), the Tenth Circuit reviewed an instruction which stated that the presumption of innocence was " 'not intended to shield those who are actually guilty from just punishment, but is a humane provision of the law which is intended for the protection of the innocent and to guard against the conviction of those unjustly accused of crime.' " Id. at 404-05. In reaching the result that "[t]here is ... nothing in this instruction from which it could be inferred that the presumption does not go with the guilty defendant as well as with the innocent," id. at 405, the court appeared to ignore the plain meaning of the trial court's charge, and was contradictory in its reasoning. It first stated that "the rule of law which throws around a defendant the presumption of innocence is intended as a protection for the innocent, and, conversely, it is not intended to shield the guilty"--an implication that the instruction as given was actually a proper statement of the law. Id. The opinion then seems to jump tracks by stating that "[o]f course the presumption of innocence goes with those who are actually guilty throughout the trial, as well as with the innocent, and a guilty defendant is entitled to the benefit of this presumption until the force and effect thereof is overcome by the government." Id. We might have thought that this latter point, which is in direct conflict with the given charge, would have settled the matter in favor of the defendant.
 
 
 49
 We find the holdings of those circuits which have disapproved this sort of instruction, beginning with Gomila v. United States, 146 F.2d 372, 373 (5th Cir.1944), to be more compelling and well-reasoned. In Gomila, the Fifth Circuit found reversible error, in conjunction with several other errors of law,[11] in an instruction providing that:
 
 
 50
 as forceful as [the presumption of innocence] is in protecting one charged with crime, it must never be forgotten that it was not intended, nor has it ever been intended, as extending an aid to one, who in fact is guilty, so that he may escape just punishment. The rule is but a humane provision of the law, intended to prevent, so far as human agencies can, the conviction of an innocent defendant, but absolutely nothing more."
 
 
 51
 Id. at 373. The Fifth Circuit firmly stated that this:
 
 
 52
 is not a correct statement of the law. The presumption of innocence applies alike to the guilty and to the innocent.... The fact of guilt does not enter into the application of the rule, the intent and purpose of which is to protect all persons coming before the courts charged with crime until the presumption of innocence is overthrown by evidence establishing guilt beyond a reasonable doubt....
 
 
 53
 Id.
 
 
 54
 The Ninth Circuit followed the Fifth in Reynolds v. United States, 238 F.2d 460 (9th Cir.1956). Reynolds considered a jury charge which provided that the presumption of innocence was "intended to guard against the conviction of an innocent person, but it is not intended to prevent the conviction of any person who is in fact guilty, or to aid the guilty to escape punishment." 238 F.2d at 462. The Ninth Circuit first reviewed Gomila and Farina, and next the converse holdings of Moffitt and "a long line of cases" from the Illinois state courts, e.g., People v. Henderson, 378 Ill. 436, 38 N.E.2d 727 (1941), and concluded that the former result was the better one. Though Reynolds conceded that the presumption of innocence "was not developed for the purpose of aiding the guilty to escape punishment" but, rather, "for the purpose of guarding against the conviction of an innocent person," 238 F.2d at 463, it nevertheless found prejudicial error in the qualifying phrase of the instruction. The reasoning of the Ninth Circuit is worth quoting at length:
 
 
 55
 It is ... perfectly plain that the presumption, together with the related rule on the burden of proof, in guarding against the conviction of an innocent person, may in some cases prevent the conviction of a person who is actually guilty.... This is a calculated risk which society is willing to take .... because it regards the acquittal of guilty persons less objectionable than the conviction of innocent persons. The inclusion of the qualification in question ... is designed to curb that calculated risk .... by implying that society is just as anxious to convict the guilty as it is to acquit the innocent. The implication is false.... It subverts the presumption, since it distracts attention from its paramount purpose of protecting the innocent. When this qualification is added to an instruction on the presumption of innocence, the result is to leave matters about where they would have been had no instruction on the presumption been given. Since it is right to instruct on the presumption of innocence, it is wrong to add this self-defeating qualification.
 
 
 56
 Id. (new paragraphs omitted). The Ninth Circuit reiterated this position in Shaw v. United States, 244 F.2d 930 (9th Cir.1957), though it did not there reverse the defendant's conviction:
 
 
 57
 Our acute awareness of the rights of a defendant has discovered that such an instruction might mislead a jury in a case where the facts are in doubt, as was the situation in Reynolds v. United States. [Although] we are not bound to reverse in every case where the instruction may have been given, notwithstanding the obvious guilt of the defendant and the overwhelming weight of facts which are not even contested[, o]ur disapproval of the instruction stands.
 
 
 58
 Id. at 939.
 
 
 59
 The Seventh Circuit has also taken exception to a charge which implies that the reasonable doubt standard does not apply to the guilty. United States v. Bridges, 499 F.2d 179 (7th Cir.1974), evaluated the propriety of an instruction which stated that "there is nothing mysterious about the term 'reasonable doubt.' It is not for the purpose of permitting guilty men to escape, but it is a rule for the protection of the innocent." 499 F.2d at 186. Bridges stated simply that this instruction had been criticized by other circuits, was not approved by the LaBuy Jury Instructions in Federal Criminal Cases, was objectionable, and should be deleted upon retrial. Id.
 
 
 60
 We reaffirm the proposition that the presumption of innocence and the beyond-a-reasonable-doubt standard apply to all criminal defendants without regard to their actual guilt or innocence. This principle is woven throughout the cloth of American jurisprudence. For example, discussion of both the presumption of innocence and the reasonable doubt standard has often generated reference to the idea that, under the American system of justice, it is preferable to let ten guilty men go free than to convict one innocent man, e.g., Furman v. Georgia, 408 U.S. 238, 367 n. 158, 92 S.Ct. 2726, 2791 n. 158, 33 L.Ed.2d 346 (1992) (Marshall, J., concurring); Bunnell v. Sullivan, 947 F.2d 341, 352 (9th Cir.1991) (in banc) (Kozinski, J., concurring); United States v. Greer, 538 F.2d 437, 441 (D.C.Cir.1976); 4 William Blackstone, Commentaries, ch. 27, p. 358;[12] see Winship, 397 U.S. at 372, 90 S.Ct. at 1076-77 (Harlan, J., concurring) ("In a criminal case ... we do not view the social disutility of convicting an innocent man as equivalent to the disutility of acquitting someone who is guilty.... [The reasonable doubt standard is] bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free."). This notion necessarily encompasses an implicit understanding that the two rules of law must apply to all defendants, regardless of their actual guilt or innocence, if the purpose of the rules is to be achieved.
 
 
 61
 A jury instruction which directly contradicts this principle should not be given. We are convinced that the instruction given by the court incorrectly states both the reasonable doubt standard and the presumption of innocence. First, it implies that a person who is actually guilty, in the sense of "what really happened," as opposed to the sense of having been legally determined to be guilty, is not entitled to the presumption of innocence throughout trial and deliberations. This places the cart before the horse. If the jury believes that it is to ask whether the defendant is likely actually guilty, and need only place the mantle of the presumption of innocence upon him if the answer is "no," the "presumption" is meaningless. Second, the instruction erodes the reasonable doubt standard. It allows a reasonable juror to understand--quite incorrectly--that she may take it upon herself to make a premature evaluation of the case and need not hold the Government to its strict burden if she is otherwise convinced of the accused's guilt. The presumption of innocence and the reasonable doubt standard are eviscerated if the jury believes that it must, or even may, make a determination of the defendant's guilt or innocence before evaluating the strength of the Government's case. The instruction may also undermine allocation of decision-making authority in the trial court by permitting the jury, which is entrusted with upholding the reasonable doubt standard, to infer that the judge himself believes the defendant to be guilty.
 
 
 62
 A natural inclination of some jurors may be to assume that, because the defendant has been selected for prosecution, he must be guilty. One of the greatest responsibilities of the trial judge is her duty to overcome that inclination by impressing upon the jury the importance of the presumption of innocence and of the Government's burden to prove guilt beyond a reasonable doubt. See Holbrook v. Flynn, 475 U.S. 560, 567-68, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525 (1986) (both defense counsel and the trial judge have the responsibility diligently to impress upon jurors the need to presume the defendant's innocence); Birbal, 62 F.3d at 462-63 ("Since Winship, few elements of due process have been clearer than the necessity of informing the jury that, to convict, it must find each defendant guilty beyond a reasonable doubt of every element charged."). As the Supreme Court noted in Winship, the reasonable doubt standard is vital in part because it ensures against unjust convictions and reduces the risk of factual error. 397 U.S. at 363, 90 S.Ct. at 1072; see also, Jackson, 443 U.S. at 315, 99 S.Ct. at 2787. In order to reduce those risks, then, the jurors must be made to see that the case against the defendant begins as a tabula rasa, a slate upon which may be written only such marks as derive from the evidence admitted at trial. Unless and until the Government meets its burden of proof beyond a reasonable doubt, the presumption of innocence remains with the accused regardless of the fact that he has been charged with the crime, regardless of what is said about him at trial, regardless of whether the jurors believe that he is likely guilty, regardless of whether he is actually guilty. The presumption attaches to those who are actually innocent and to those who are actually guilty alike throughout all stages of the trial and deliberations unless and until that burden is met. A jury charge which implies otherwise creates a serious risk of undermining that vital protection.[13]
 
 
 63
 We next address whether the erroneous instruction given by the court created a "reasonable likelihood" of misleading the jury. Because the charge must be evaluated in its entirety, we take note of the district court's final instruction to the jury, which undisputedly contained a more accurate summation of the reasonable doubt standard and the presumption of innocence than did his earlier statement:
 
 
 64
 As we discussed at the beginning, a defendant is presumed innocent unless and until proven guilty. This presumption of innocence alone is sufficient to acquit the defendant if the Government has failed to prove the charge beyond a reasonable doubt. The indictment is an accusation and only that. It's not proof of anything at all, nor is it evidence. A defendant is presumed innocent unless and until you decide unanimously that the Government has proven the defendant's guilt beyond a reasonable doubt. This then just raises the question of just what is proof beyond a reasonable doubt. Some of you may have served as jurors in civil cases where you were told that it was only necessary to prove that a fact is more likely true than not true. In criminal cases the Government's burden of proof is more powerful than that. Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt.
 
 
 65
 While this final section of the court's instructions was undoubtedly more appropriately worded than was its reference to guilty defendants, we nevertheless agree with Judge Frank's remark in his Farina dissent: "What influences juries, courts seldom know." 184 F.2d at 21 (Frank, J., dissenting). We cannot be sure whether Doyle's and Vance's jury actually misunderstood its obligations under the presumption of innocence and the reasonable doubt standard. But, under the Boyde analysis and under Sullivan, we need not be sure. We need only determine whether there is a reasonable likelihood, even if less than a probability, that the jury misunderstood these principles of law. As discussed above, we are persuaded that the charge in its entirety created more than a possibility of jury misinterpretation and risked the factual error and unjust conviction against which Winship warned. We therefore hold that it created a reasonable likelihood that the jury misunderstood the reasonable doubt standard and the presumption of innocence.
 
 
 66
 Although instructions correctly explaining the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt, when given "repeatedly," see Ciak, 102 F.3d at 45; Bifield, 702 F.2d at 351, can render a charge in its entirety adequate to avoid reversal, despite inclusion of the objectionable "protect-the-innocent" language, we do not think the entire charge in this case sufficed to avoid the risks against which Boyde and Sullivan warned. We therefore reverse and remand for a new trial, with the expectation that we are not likely again to see this ill-advised language included in instructions given by district courts in this Circuit.[14]
 
 2. Good Faith Theory of Defense
 
 67
 Doyle independently asserts that the court committed reversible error by refusing his requested charge as to the defense of "good faith," which he asserts was the centerpiece of his entire defense. Having testified that he did not know or intend that the fuel pumps he purchased would ultimately be shipped to Libya, Doyle requested that the court add the following detailed charge on the defense of good faith:
 
 
 68
 ... good faith is an absolute defense to the charges in this case. If you find that the defendant believed in good faith that the fuel pumps or other equipment were going to a non-embargoed destination, you should find him not guilty. The burden of establishing lack of good faith and criminal intent rests upon the prosecution. A defendant is under no burden to prove his good faith, rather the prosecution must prove bad faith beyond a reasonable doubt.
 
 
 69
 As to the conspiracy charge, the court gave instruction regarding knowing participation:
 
 
 70
 To participate knowingly means to act or participate voluntarily and intentionally, and with a specific intention to do something the law forbids or failed to do something that the law requires to be done. In short, to act or participate with a bad purpose, to disobey or to disregard the law.... Indeed, as I've already instructed you, before you may conclude that the defendant was a member of the alleged conspiracy, you must be satisfied that he knowingly associated himself with the conspiracy with the intent to aid in the accomplishment of at least one of its unlawful goals.
 
 
 71
 As to the substantive export counts (counts two and three), the court charged that:
 
 
 72
 In order to sustain its burden of proof with respect to Counts 2 and 3, the Government must prove beyond a reasonable doubt ... that the defendants did on or about the date specified knowingly and willfully export or cause to be exported from the United States to Germany for transshipment to the People's Republic of Libya through the Republic of Malta gear type fuel pumps.
 
 
 73
 The court then defined "knowing" and "willful," and instructed as to the defense of good faith:
 
 
 74
 Now, in connection with all of the charges in this indictment, a defendant acts knowingly when he acts intentionally and voluntarily. Knowledge is established, however, if a person is aware of a high probability of its existence, unless he actually believes that the fact does not exist. A defendant does not act knowingly however, if he acts out of ignorance, mistake, accident, or carelessness. A defendant acts willfully when he acts with a specific intent to do some act, an act which the law defines as being illegal. A defendant's conduct is not willful [if] it was the result of a good faith understanding that he was acting within the requirements of the law.
 
 
 75
 A defendant is entitled to a jury charge which reflects his defense. United States v. Vasquez, 82 F.3d 574, 577 (2d Cir.1996); United States v. Pedroza, 750 F.2d 187, 205 (2d Cir.1984). "A conviction will not be overturned for refusal to give a requested charge, however, unless that instruction is legally correct, represents a theory of defense with basis in the record that would lead to acquittal, and the theory is not effectively presented elsewhere in the charge." Vasquez, 82 F.3d at 577 (citing United States v. Perez, 897 F.2d 751, 754 (5th Cir.1990)). Here, the essence of Doyle's request is effectively presented elsewhere in the charge. The indictment charged, and the court instructed, that knowledge and willfulness concerning the ultimate destination of the equipment is an element of the offense that the Government was required to prove beyond a reasonable doubt. It was not error for the court to refuse to charge that the Government had the burden to prove bad faith, when it had already charged that the Government had to prove willfulness and that good faith was a defense to the willfulness element.
 
 3. Charge--Evidence of Habit
 
 76
 Appellants both assert that the court improperly refused to charge the jury on evidence of habit relating to their fifteen year practice of describing all shipments from Cheshire to Germany as "auto spares." Appellants requested the following charge:
 
 
 77
 In this respect you should consider the defendant's habit and routine practice of placing the description auto spares on the shipper's letter of instruction for all shipments exported from the United States. This evidence may be considered by you in determining whether the defendant acted in good faith when the equipment was exported from the United States.
 
 
 78
 We do not find it improper for the court to have refused to characterize Doyle's and Vance's pattern of so describing their shipments as habit evidence. Doyle and Vance certainly were free to present evidence and to argue that their practice of labeling their shipments as "auto spares" was demonstration of their innocence. Had the trial court characterized this evidence as "habit," it would have thereby removed from the jury the critical question of fact underlying their conviction on three of the main charges--Counts Four, Five, and Six, which all related to the defendants' violation of the Export Administration Act provision illegalizing the false description of the contents of exports on export control documentation--namely, whether this practice was undertaken intentionally or simply carelessly. As noted in the prior section of this opinion, the court did instruct the jury that "[a] defendant does not act knowingly ... if he acts out of ignorance, mistake, accident, or carelessness." This instruction permitted the jury to decide this question of fact as it saw fit. The trial court properly refused to grant the requested charge regarding habit, a charge which would have given a wink of the eye to bold-faced misdescriptions of the goods being shipped.
 
 B. Evidentiary Points
 
 79
 In addition to the charge matters, appellants also take issue with three evidentiary rulings.
 
 1. U.S. Army Intelligence Testimony
 
 80
 Doyle first independently contends that the court also violated his rights to Due Process and to present a defense by denying him the opportunity to subpoena U.S. Army Intelligence agents for whom Doyle worked during the period of the conspiracy, and by excluding trial testimony relating to specific actions against Libya which Doyle allegedly took in cooperation with the U.S. Army Intelligence Agency to promote the U.S. security policy toward Libya. At a preliminary hearing, the district court ruled that Doyle would be able to testify as to the facts of his life history and employment including any relationship with U.S. intelligence agencies, but found that testimonial and documentary evidence of specific acts taken by Doyle in cooperation with army intelligence were either not relevant to or inadmissible at this trial.
 
 
 81
 Doyle contests the denial of his motion pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to order the Government to disclose the names of army intelligence agents who had received information from Doyle concerning the Libyan military. Doyle sought to use testimony from those agents as part of his defense. He also contests the trial court's decision to exclude the defense's copies of technical documents concerning Libya and other nations that Doyle had turned over to the army intelligence agents. Doyle says that proof of these specific acts is admissible under Fed.R.Evid. 405(b) to go to a direct element of the crime charged--knowledge or intent--,[15] because those acts indicate that he would not knowingly act contrary to American policy toward Libya.
 
 
 82
 The Government argues that the district court correctly determined that neither the testimony of the agents nor the documentary evidence was relevant to a trial of the charges against Doyle, and that, even if the evidence were relevant, proof of the character of the defendant through evidence of specific acts is not admissible under Fed.R.Evid. 405(b) when character is not an element of the crimes charged. We agree with the Government on both points.
 
 
 83
 We review the trial court's decision to exclude evidence that is either irrelevant or potentially misleading for a clear abuse of discretion. United States v. Amuso, 21 F.3d 1251, 1262 (2d Cir.1994); United States v. Wilson, 750 F.2d 7, 9 (2d Cir.1984). The trial court was well within its proper authority to decide either that Doyle's past cooperation with army intelligence had no bearing on the crimes charged, or that any probative value was substantially outweighed by the risk of confusing the jury with extraneous matters, or of wasting the court's and jury's time.
 
 
 84
 We also agree with the Government that proof of Doyle's specific acts under Rule 405(b) was not admissible. See Wilson, 750 F.2d at 9 ("It is a proper exercise of a district court's discretion ... to exclude evidence of specific acts intended to demonstrate character traits not at issue.") Character is not an element of any of the crimes with which Doyle was charged. As Weinstein's treatise on Evidence warns, "permissive use of evidence of specific acts is regularly misinterpreted by trial lawyers. It is allowed only when character itself is an issue under substantive law." The treatise goes on to give as an example the issue of an employee's fitness to do her job in an action against the employer. J. Weinstein, M. Berger & J. McLaughlin, 2 Weinstein's Federal Evidence § 405.05 (1997). This is clearly not such a case. Doyle's argument that character was an element of these charges, because "he was charged ... with intending to violate a national security policy of the United States[,]" distorts Rule 405 beyond recognition. As the trial court recognized, if specific good deeds could be introduced to disprove knowledge or intention, which are elements of most crimes, the exception of Rule 405(b) would swallow the general rule of 405(a) that proof of specific acts is not allowed. We therefore agree fully with the trial judge's exclusion of this evidence.
 
 2. Nothacker Deposition
 
 85
 This point concerns an exception to the hearsay rule that applies when the declarant is not available to testify at trial. Appellants sought to introduce at trial portions of Nothacker's unsworn statements made to the Government during its investigation of this case on September 7, 1994, prior to the indictment of either of the appellants. In these statements, Nothacker said he never informed Doyle that Libya was the ultimate purchaser of the parts supplied by the appellants. The district court found both that Nothacker was unavailable to testify at trial, and that the statements he made were against his penal interest. The court, however, excluded the statements for lack of indications of trustworthiness in the circumstances surrounding the statement, as required by Fed.R.Evid. 804(b)(3). The district court's decision was based on the fact that the portions of Nothacker's proffer statements that appellants sought to introduce in support of their defense were expressly recanted in a stipulation executed as part of the corporate plea agreement between the Government and ISP. Appellants jointly contend that the statements exculpated them, and were admissible under Fed.R.Evid. 804(b)(3); they further assert that their Fifth Amendment rights to Due Process of law as well as their Sixth Amendment rights to present their defense were infringed upon by the court's exclusion of Nothacker's statements.
 
 Federal Rule of Evidence 804 provides:
 
 86
 (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 
 
 87
 * * *
 
 
 88
 (3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
 
 
 89
 Neither party contests the district court's determination that Nothacker was unable to testify at the appellants' trial. Appellants, arguing that unsworn statements made during an investigation are more reliable than a sworn statement made as part of a later plea bargain, assert that the district court erred in not finding Nothacker's initial statements to the investigators trustworthy. Specifically, appellants point out that the statements were made to an Assistant United States Attorney and in the presence of the declarant's counsel, that no notice was given to either of the appellants or to their attorneys, and that Nothacker's account of what he did and did not say to Doyle was consistent over the course of the entire interview, which filled 139 pages of transcript.
 
 
 90
 The Government, on the other hand, argues that the district court correctly concluded that the statements were not sufficiently corroborated[16]. We agree that the district court's exclusion of the statements as untrustworthy was not an abuse of its evidentiary discretion.
 
 
 91
 Nothacker's statements were offered by the defense to exculpate Doyle and Vance and are, therefore, subject to the last sentence of Rule 804(b)(3), which requires that "corroborating circumstances clearly indicate the trustworthiness of the statement" (emphasis added). The court does not have to conclude that the statements sought to be admitted were surely true, for it is the role of the jury--not the court--to assess the credibility of witness testimony. Yet, because hearsay testimony lacks the traditional assurances of reliability such as the effect of the solemn courtroom on the witness and the more significant opportunity for cross-examination by the opposing party, the court does need to assure itself that there are, at least, clear indicia of reliability.
 
 
 92
 The district court found that the circumstances surrounding Nothacker's statements did not indicate that the statements were trustworthy. The burden is on the accused to justify admission of the statement by demonstrating that the statements are sufficiently corroborated. United States v. Salvador, 820 F.2d 558, 561 (2d Cir.1987). We review a district court's decision to exclude statements under Rule 804(3)(b) for an abuse of discretion. United States v. DeVillio, 983 F.2d 1185, 1189 (2d Cir.1993) (citing cases).
 
 In Salvador, 820 F.2d at 561-62, we said:
 
 93
 Exactly what needs to be corroborated ... is not absolutely clear from the rule or from much of the case law. Corroboration of the trustworthiness of the statement could mean that the district judge is to require corroboration of the declarant's trustworthiness, focusing on declarant's reliability when the statement was made, or corroboration of the truth of the declarant's statement, focusing on whether the evidence in the record supported or contradicted the statement, or both. Cf. Tague, Perils of the Rulemaking Process: The Development, Application, and Unconstitutionality of Rule 804(b)(3)'s Penal Interest Exception, 69 Geo. L.J. 851, 949-53 (1981). Our court seems to require corroboration of both.
 
 
 94
 (Additional citations omitted.)
 
 
 95
 This conclusion was confirmed in United States v. Bahadar, 954 F.2d 821, 829 (2d Cir.1992), which explained:
 
 
 96
 "The corroboration requirement of the Rule should be construed to effectuate its purpose of 'circumventing fabrication.' " United States v. Rodriguez, 706 F.2d [31,] 40 [ (2d Cir.1983) ] (quoting Fed.R.Evid. 804 advisory committee's note). To this end, our cases have required corroboration of both the declarant's trustworthiness as well as the statement's trustworthiness.
 
 
 97
 Bahadar, 954 F.2d at 829 (additional citations omitted) (emphasis in original). On the other hand, 5 Weinstein's Federal Evidence § 804.06[c] states that "[i]t is the statement, not the witness or the declarant, that must be trustworthy." As the treatise notes, "[t]he corroboration requirement should not be used as a means of usurping the jury's function" of evaluating the credibility of witnesses. Id. In any event, the credibility of an absent declarant is a consideration pertinent to the probative value of her or his testimony and, thus, relevant to a judge's decision to admit or exclude evidence under the ever-vigilant Fed.R.Evid. 403, even if not a proper question for the judge under Rule 804. See id. Accordingly, our circuit's position, as stated in Salvador and Bahadar, can be justified as a proper exercise of the trial judge's discretionary authority under a combination of Rules 804 and 403.
 
 
 98
 In view of the changes in the declarant's story, Bahadar approved the decision of the district court to exclude his statements. While Nothacker may not have altered his story as many times as did the absent declarant in Bahadar, the former's inconsistent stories suggest a similar risk of fabrication. We do not think that the specific indications of trustworthiness mentioned by the appellants, such as the presence of counsel, outweigh this fundamental concern. Given that the other evidence at trial supported Nothacker's later statement and contradicted his earlier assertions that he never discussed the identity of the ultimate purchaser with Doyle, we easily conclude that the district court cannot be faulted for excluding the statements. In light of this conclusion, we also reject appellants' claim that the district court's decision violated their rights under the Fifth and Sixth Amendments to the Constitution.
 
 3. Malta Records
 
 99
 Doyle and Vance also contest the district court's decision to consider as authentic under Fed.R.Evid. 902(3), and to admit into evidence, documents collected by, but not generated by, the government of Malta. The evidence in question was delivered to the court by Malta pursuant to the international letter rogatory from the district court, and was attested to as authentic by a Senior Inspector in the Customs Department whose signature was verified by the Deputy Attorney General of the Republic of Malta. Some of the documents introduced were generated by the Customs Department of Malta, and others were filed with that department by private companies, including shipping agencies. The appellants' objections are aimed at the latter group of records: those generated by private parties and recorded with the government. Appellants and the Government disagree as to how many of the documents admitted fall into this category, and the record submitted to this court does not permit us to resolve the issue.
 
 
 100
 Appellants advance two reasons why it was error to admit these documents. First, they assert that Fed.R.Evid. 902(3), pursuant to which these documents were authenticated, applies only to documents generated by a foreign government. Second, appellants assert that these documents were inadmissible hearsay. The Government asserts that the hearsay argument was waived by the Appellants, because it was not articulated below. But, the Government agrees that the appellants did object to the introduction of the "private" documents as foreign public documents filed with the government of Malta. We quickly dispose of appellants' first contention, before turning to the hearsay issue.
 
 
 101
 a. Authentication.
 
 
 102
 Rule 902(3) establishes various methods of authenticating foreign documents. Neither party disputes that the certificates of the Senior Inspector and of the Deputy Attorney General of Malta are adequate authentication for government records under subsection (3). Rather, the issue is whether this authentication is adequate with respect to documents recorded, or filed with, the government. Rule 902 speaks directly to this issue; it states:
 
 
 103
 [e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to ...
 
 
 104
 (4) [a] copy ... of a document authorized by law to be recorded or filed and actually recorded or filed in a public office ... certified as correct ... by certificate complying with paragraph ... (3) of this rule....
 
 
 105
 See also, John William Strong et al., McCormick on Evidence § 224 (4th ed.1992) ("it is the official duty to record and maintain the document, rather than the duty to prepare it, which constitutes the document a public record" for the purpose of authentication). The requirement that the document be "certified as correct" means only that the authenticating official certify that the copy delivered to the court is an accurate copy of the government record. To satisfy Rule 903, the official does not need to attest to the truth or trustworthiness of the facts contained in the document; accuracy of its content is the concern of other Federal Rules, such as the many rules concerning hearsay in Rules 801, et seq. The only concern of Rules 901, et seq. is assuring that evidence is what it purports to be. See United States v. Darveaux, 830 F.2d 124, 125 (8th Cir.1987); United States v. Torres, 733 F.2d 449, 455 n. 5 (7th Cir.1984). The certification of the Maltese officials was clearly adequate to show that these were the records of the Customs Department. We therefore rule that all documents delivered to the district court by Malta were properly self-authenticated pursuant to Rule 903(3) and (4).
 
 
 106
 b. Hearsay.
 
 
 107
 It is axiomatic that authenticated evidence must still be admissible under the other rules of evidence including those governing hearsay. See, e.g., Raphaely Int'l, Inc. v. Waterman S.S. Corp., 972 F.2d 498, 502 (2d Cir.1992). We do not agree with the Government that the appellants waived their hearsay objection to the privately-generated, public records by not raising it to the trial court. Appellants' counsel did not, in the portion of the record called to our attention, say the word "hearsay" or mention Rules 801, et seq. Moreover, the objection did mix the issue of authenticity with the issue of admissibility on other grounds. Nevertheless, counsel correctly sought to explain the reasons that the business records were improper hearsay absent further foundation. At a sidebar conference, counsel said: "Normally you have a custodian who comes in and gives predicate testimony so that the Court can make a finding of admissibility or not. Here, we're denied our right of confrontation if we're not permitted or able, and we're not able, to cross-examine the person who says whatever they say in the attestation." The attorney also referred to the evidence as "documents of a private business." Although it is certainly desirable that trial counsel refer to the Federal Rules of Evidence by number when making an objection, we find that counsel's accurate description both of the operation and the policy behind Rule 803(6) was an adequate articulation of the hearsay objection. We therefore turn to the question whether appellants' counsel was correct that a foundation was required for the admission of the contested documents, since the issue will doubtless arise on any retrial.
 
 
 108
 The disputed evidence could conceivably fall into either of two long-established exceptions to the rule against hearsay, those for business or government records. The difference between the treatment of government and business records under the Federal Rules was explained well by Judge Ferguson in his dissenting opinion in United States v. Regner:
 
 
 109
 Both Rule 803(6) and Rule 803(8) allow the admission of what would otherwise be inadmissible hearsay testimony. The former admits into evidence records of regularly conducted business activities. The latter admits records of public offices or agencies. The difference in operation between the two is that 803(6) requires the "testimony of the custodian or other qualified witness," J. Weinstein & M. Berger, 4 Weinstein's Evidence p 803(6) at 803-151 through -152 (1979), while 803(8) does not require any foundational testimony, id. p 803(8) at 803-191.
 
 
 110
 677 F.2d 754, 761 (9th Cir.1982) (footnote and additional citations omitted). The foundation required for the business records exception to the hearsay rule was not met here.[17] The Senior Inspector in the Customs Department could not possibly testify as to the practices of the private businesses that generated the documents filed with the Customs Department. Cf. United States v. Leal, 509 F.2d 122, 127-28 (9th Cir.1975) (assistant manager of hotel swore to United States Vice Consul in Hong Kong that records admitted at trial were prepared in the normal course of business at the hotel). The question is, thus, whether the fact that these business documents were filed with a government agency, an act which implies some endorsement of their veracity by the filer, is such an adequate assurance of trustworthiness that the contested documents may be admitted under 803(8) without further foundation. Although the issue is extremely close, we think it doubtful that the district court could have admitted these records as public documents on this record.
 
 Rule 803(8) provides:
 
 111
 Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.
 
 
 112
 Rule 803(8)(B) can encompass statements of non-governmental parties who act as agents for the government under duties imposed by law. See, e.g., United States v. Meyer, 113 F.2d 387, 397-98 (7th Cir.1940) (map prepared by engineer for the government from information furnished by persons under his supervision admissible as government record) (cited by Advisory Committee Note to Rule 803). The Senior Inspector's sworn statement stated that the documents he delivered "set forth matters which are required by the laws of Malta to be recorded and filed." In this case, however, there was no showing of procedures that assure the documents are reliable, of any standards applied to the recordation of the documents, or of any monitoring by Malta of their accuracy. Malta may, in some fashion, punish the making of false statements to the customs agency, but the Government has pointed us to no authority saying that it does so. Furthermore, we doubt that a legal "request" for filing records with a government agency would alone qualify the records for the hearsay exception without some showing that the records were reliable, such as a showing that the private party was acting as an agent of the government. See United States v. Harris, 942 F.2d 1125, 1129 n. 3 (7th Cir.1991) (stating, in dicta, that gift tax return of an individual is inadmissible hearsay); see also, 5 Wigmore, Evidence § 1633a (Chadbourn rev.1974) (distinguishing between "a genuine official duty" and "a mere penal responsibility").
 
 
 113
 Despite the fact that these records lie at the intersection of two traditionally reliable types of hearsay evidence, i.e., business and government records, it would be a major step judicially to forge a new, hybrid exception to the hearsay rule by combining these two distinct varieties of admissible hearsay simply to correct the Government's failing to offer a witness who could present the foundation necessary for the admission of the documents under the business records exception. We find that the admission of privately-generated, business records without further foundation, even though the records were found in the possession of a foreign government agency, would in all probability be an abuse of the discretion by the trial court. Were there any other evidence that documents recorded with the Customs Agency of Malta were verified or otherwise reliable, the argument for admitting them as government records would be stronger.
 
 
 114
 As we are already remanding this matter for a new trial for the reasons explained in Part A.1, supra, and, because it is impossible for us to determine the importance of the documents improperly admitted from the portions of the record supplied to this court on appeal, we call this issue to the attention of the district court as it may arise again on retrial.
 
 Conclusion
 
 115
 We hold that a jury instruction stating that the presumption of innocence and the reasonable doubt standard apply only to the innocent and not to the guilty is erroneous, and that such instruction created a reasonable likelihood that Doyle's and Vance's jury misunderstood those principles of law. We therefore reverse and remand for new trial. On remand, we encourage the Government and the trial court to evaluate our comments regarding the privately generated documents submitted to the Maltese Customs agency.
 
 
 
 *
 Honorable Sidney H. Stein, District Judge, United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 The Executive Order excluded articles intended to relieve human suffering
 
 
 [2]
 Prior to its sale to Doyle, IMO had never sold the fuel pumps to any purchaser other than Solar Incorporated in San Diego, California, the manufacturer of the engine on which the pump operated
 
 
 [3]
 The pumps, however, were not designed to operate on naphtha fuel, and thus were returned from Libya by Bonello on May 15, 1990, and subsequently shipped back to IMO because they failed to perform on the fuel in the proportion used by the ultimate customer. IMO engineers then attempted to repair the pumps to work on naphtha fuel
 
 
 [4]
 At another time, Vance indicated to a different Philadelphia Gear salesperson that the same parts were going to Germany
 
 
 [5]
 The conversation is devastatingly revealing and inculpatory
 
 
 [6]
 The Farina district court charged the jury, in part:
 Every defendant is entitled to rest upon the presumption of innocence in his favor.
 The burden of establishing the guilt of each of these defendants beyond a reasonable doubt rests upon the Government, and this burden never shifts.
 This presumption of law inures to the benefit of all defendants charged with crime. It was designed for the protection of the innocent. It was not intended as a bulwark behind which the guilty might hide. If, however, the Government produces evidence which rebuts the presumption of innocence, and if the evidence convinces you of the guilt of a defendant, beyond a reasonable doubt, then the presumption of innocence ceases to exist as to that particular defendant.
 Farina, 184 F.2d at 20.
 
 
 [7]
 The challenged Bifield charge stated, in part:
 It is the sworn duty of Courts and jurors to safeguard the rights of persons charged with a crime by respecting the presumption of innocence which the law imputes to every person so charged, but the law is made to protect innocent persons and not to protect guilty ones. If and when that presumption of innocence has been overcome by evidence, proving beyond a reasonable doubt that an accused person is guilty of the crime charged, then it is the sworn duty of the jury to uphold the law and to render a verdict of guilty.
 Bifield, 702 F.2d at 351 n. 4.
 
 
 [8]
 The relevant charge in Ciak read as follows:
 I want to remind you again that it's the sworn duty of the courts and jurors to safeguard the rights of persons charged with crimes by respecting the presumption of innocence which the law imputes to every person so charged and by making the government meet its burden of proving guilt beyond a reasonable doubt. You must keep in mind that those rules of law are designed to protect the innocent and not the guilty. If and when the presumption of innocence has been overcome by evidence proving beyond a reasonable doubt that the accused is guilty of the crime charged, then it's your sworn duty to enforce the law and render a verdict of guilty.
 102 F.3d at 45 (emphasis supplied).
 
 
 [9]
 "The standard provides concrete substance for the presumption of innocence--that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.' " Id. (quoting Coffin, 156 U.S. at 453, 15 S.Ct. at 402.)
 
 
 [10]
 An appropriate reasonable doubt jury instruction, alone, may be insufficient to protect the rights of the defendant under both tenets of law, and an accompanying presumption of innocence instruction may be necessary to safeguard that distinct protection. See Coffin, 156 U.S. at 460-61, 15 S.Ct. at 405-06; see also, Taylor, 436 U.S. at 485, 488, 98 S.Ct. at 1935, 1936 (due process required instruction on presumption of innocence; instruction on reasonable doubt alone was insufficient to accomplish "both the special purpose of a presumption-of-innocence instruction and the particular need for such an instruction in this case"). But see Kentucky v. Whorton, 441 U.S. 786, 789, 99 S.Ct. 2088, 2090, 60 L.Ed.2d 640 (1979) (such failure "does not in and of itself violate the Constitution," but rather must be evaluated in the totality of the circumstances); Delo v. Lashley, 507 U.S. 272, 278, 113 S.Ct. 1222, 1226, 122 L.Ed.2d 620 (1993) ("An instruction is constitutionally required only when, in light of the totality of the circumstances, there is a ' "genuine danger" ' that the jury will convict based on something other than the State's lawful evidence, proved beyond a reasonable doubt." (quoting Whorton (quoting Taylor, 436 U.S. at 488, 98 S.Ct. at 1936)))
 
 
 [11]
 The fact that Gomila found cumulative error, rather than clearly resting its reversal upon the error in the presumption of innocence charge, was a point of distinction in Farina. See Farina, 184 F.2d at 20; but see id. at 23 (Frank, J., dissenting) ("My colleagues ... differentiate the charge in the Gomila case because it contained a 'cumulation of errors.' But so, too, here.")
 
 
 [12]
 See also, Goetz v. Crosson, 967 F.2d 29, 39 (2d Cir.1992) (Newman, J., concurring) ("[W]e might not all agree on the number of wrongful acquittals we are willing to accept to guard against one wrongful conviction."); LeRoy Pernell, The Reign of the Queen of Hearts: The Declining Significance of the Presumption of Innocence--A Brief Commentary, 37 Clev. St. L.Rev. 393, 395 (1989) (discussing the historical trail of the presumption, and comparing Blackstone's reference to ten guilty men with that of Fortescue (twenty guilty men) and Lord Hale (five of same)); see generally Jon O. Newman, Beyond "Reasonable Doubt", 68 N.Y.U.L.Rev. 979, 981 & nn. 5-7 (1993) (Madison Lecture)
 
 
 [13]
 While the Ninth Circuit is likely correct that one of the policies underlying these two rules of law is protection of the truly innocent, Reynolds, 238 F.2d at 463, discussion of that policy is best reserved for law review commentary and law school classrooms. Presentation of that policy to the jury by the judge during the charge risks its destruction
 
 
 [14]
 We take judicial notice of jury charges given by the District Court subsequent to the argument of this appeal, which properly omitted the language that has occasioned reversal in this case
 We have no occasion on this direct appeal from a federal conviction to consider the consequence of including the disapproved language in a state court jury charge, assessed on collateral review.
 
 
 [15]
 Fed.R.Evid. 405(b) provides: "Specific instances of conduct.--In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct."
 
 
 [16]
 The Government also urges that the specific statements upon which the appellants wished to rely at trial were not against the interest of Nothacker within the meaning of Rule 804(b)(3) and Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). Williamson construed the word "statement" in Rule 804 narrowly to require that the expression sought to be admitted must be against the interest of the declarant when made. Id. at 600-01, 114 S.Ct. at 2435-36. Nothacker's assertions that he never informed Doyle of the identity of the ultimate purchaser did suggest that only he--not Doyle--possessed the illegal intention to sell parts to Libya, and, thus, the statements could be characterized as inculpating Nothacker. Nothacker, however, had already accepted responsibility for the illegal shipments, and the statements concerning Doyle did not add much additional weight to his confession. The statements concerning Doyle may also have been made in an effort either to protect a co-conspirator or to discourage the U.S. Government's investigation of the illegal scheme by persuading the Government that the U.S. parties were unaware of the illegal purpose. Such an effort to shift blame away from a friend, who is also a probable focus of the investigation, cannot be fairly characterized as clearly against the declarant's penal interest even though the statements tended to limit the illegal purpose to Nothacker. Not only did Nothacker have an incentive to protect his longtime associate, Doyle, but nothacker's statements to the U.S. investigators tended to thwart a goal of the investigation, thereby increasing the likelihood that it would end without uncovering the true extent of the illegal scheme. Furthermore, Nothacker's statements were made under a proffer agreement which protected, under the condition that he tell the truth, the statements made by Nothacker from being used against him by the U.S. Attorney's Office, the U.S. Department of Commerce and the Office of Foreign Assets Control. (Govt. Br. at 37-38.) In light of these considerations, we think that the Government has made a strong showing that the statements were not so clearly against Nothacker's interest that he must have been telling the truth. We need not, however, go further than to say that we agree with the Government's first contention, i.e., appellants were not able to establish that the statements were worthy of the court's trust
 
 
 [17]
 A provision of the Crime Control Act of 1984 sets up a procedure for establishing a foundation for foreign documents for the purpose of complying with the business records exception to the rule against hearsay. Title 18 U.S.C. § 3505(a)(1) provides:
 In a criminal proceeding in a court of the United States, a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that--
 (A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters; (B) such record was kept in the course of a regularly conducted business activity;
 (C) the business activity made such a record as a regular practice; and
 (D) if such record is not the original, such record is a duplicate of the original;
 unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.
 The Government, however, did not provide a foreign certification meeting these requirements, or notify the appellants and the court of any intention to rely on this procedure for the admission of these documents as required by subsection (2)(b) of § 3505. The Government cannot, therefore, rely on § 3505. For the same reason, the Government cannot rely on the so-called "catch-all" exception to the hearsay rule, see 803(24), the last sentence of which requires adequate, prior notice to the opposing party.